PRESIDENT, ETC., OF BOWDOIN COLLEGE et al. v. MERRITT et al.

(Circuit Court, N. D. California. June 5, 1896.)

No. 11,563.

1. DEEDS DEFINED—DISTINCTION BETWEEN DEEDS AND WILLS.
   The essential difference between a deed and a will is that a deed must pass a present interest in the property, although the right to possession and enjoyment may not accrue until some future time, while an instrument which passes no interest until after the maker's death is a will.

2. SAME—DEED OF GIFT—EFFECT OF RESERVED POWER OF REVOCATION.
   An instrument which purports to be a deed, uses the language ordinarily employed in deeds, conveys a present interest to trustees named, and is executed and acknowledged as a deed, is a deed, notwithstanding the reservation of the power of revocation, modification, or substitution of the trusts, the same to be exercised within 15 years from the date of the instrument.

3. SAME—EVIDENCE—DECLARATIONS.
   The fact that the grantor in an instrument which was on its face and in legal effect a deed, with reservation of power to revoke or modify the trusts created therein, often spoke of it as her will, is not admissible in evidence to destroy its character as a deed.

4. SAME—GIFTS TO CHARITIES—STATUTORY RESTRICTIONS.
   The California statute (Civ. Code, § 1313), which provides that no property shall be "bequeathed or devised" to, or in trust for, any charitable or benevolent society, except by will executed 30 days before death, and that, when so executed, it shall not be valid for more than one-third of the estate of a testator leaving legal heirs, does not limit the right to make gifts to such societies by deed duly executed and delivered; nor will a deed for that purpose be construed as a fraud upon the statute, although the testator reserves the right to revoke or modify the same for a period of years.

5. SAME—CAPACITY TO EXECUTE DEEDS—MENTAL CONDITION.
   Bodily ailments, however severe, which do not affect the mental capacity to such an extent as to unfit the person from attending to ordinary business, or comprehending the ordinary relations of his affairs, or his duty to society, furnish no ground for setting aside a conveyance made by him.

6. SAME.
   It is not the soundness of the body, but of the mind, that is requisite to sustain the execution of instruments. The law looks only to the competency of the understanding, and neither age, nor sickness, nor extreme distress, nor debility of body will affect the capacity to make a conveyance, if sufficient intelligence remains.

**7. SAME—KNOWLEDGE OF PROPERTY CONVEYED.**
To sustain a conveyance disposing of the bulk of a large estate, it is not necessary that the grantor shall have actual knowledge of the extent, character, and location of each piece of real estate or kind of personal property of which she is possessed. It is not actual knowledge that is requisite, but the capacity to understand.

**8. SAME—TESTS OF MENTAL CAPACITY—RECOLLECTION OF RELATIVES.**
It is not necessary to the making of a valid deed of gift disposing of the grantor's property that he shall remember all his collateral relatives, and their claims upon his bounty, and be able to give their names and addresses.

**9. SAME—HABITS OF FORGETFULNESS.**
Mere habits of forgetfulness, whether in young or old, are not inconsistent with the exercise of intelligence, and sound judgment, and discretion, and are not of themselves sufficient evidence of a want of capacity to make a deed of gift disposing of the grantor's property.

**10. SAME—UNDUE INFLUENCE.**
In order to justify the setting aside of a deed on the ground of undue influence, it must appear that one party, by improper means and practices, has gained an unconscionable advantage over another. The undue influence must be such that the grantor has no free will, but stands in vinculis. It must amount to force or coercion, destroying free agency.

**11. SAME—FIDUCIARY RELATIONS—INDEPENDENT ADVICE.**
The principle as to the necessity of persons seeking independent advice before making dispositions of property to attorneys, agents, or trustees, arises only in cases where these parties are seeking to obtain some benefit or advantage for themselves. If they are not seeking such advantage, and the conveyance is not for their benefit or at their solicitation, but is made to them in trust for a benevolent or charitable use, it will be sufficient that the grantor had an opportunity to obtain independent advice, that she was not prevented from doing so, that she fully comprehended what she was doing, and that it was her own voluntary act.

**12. SAME—GIFTS TO CHARITIES—PERSUASION—UNDUE INFLUENCE.**
In order that deeds of gift for charitable purposes may be valid, their execution must be secured by honest means, but argument and influence may be fairly used. So may acts of kindness, attention, and affection. Mere advice, persuasion, or entreaty do not constitute undue influence, where there is no fraud, deceit, or fiduciary relation existing, and no force, coercion, imposition, duress, or other improper or prohibited means.

This was a suit in equity by the president and trustees of Bowdoin College and others, against James P. Merritt and others to quiet title to certain real estate. For previous proceedings, see 54 Fed. 55; 59 Fed. 6; 63 Fed. 213.

Robert Y. Hayne and George N. Williams, for complainants.

Horace W. Philbrook, J. C. Martin, A. A. Moore, A. H. Cohen, Rodgers & Paterson, E. Nusbaumer, and H. C. Campbell, for respondents.

HAWLEY, District Judge. This is a suit in equity to quiet title to certain property. The views that have been heretofore expressed, and the principles of law that have been discussed and decided by this court in this case (54 Fed. 55; 59 Fed. 6; 63 Fed. 213), will not be considered, commented upon, or reviewed. The case will now be considered upon its merits.

The main question for decision, under the issues raised by the pleadings and presented by the testimony, is whether a decree should be given against James P. Merritt, Catherine M. Garcelon's

next of kin, against Harry P. Merritt, her residuary devisee and legatee, and against George W. Reed, her administrator, declaring valid a deed of real estate of the value of $750,000, and a conveyance of personal property of the value of $500,000, and a declaration of trust, all being parts of one instrument and embracing all her property, except $14,000, alleged to have been made by her April 21, 1891, to John A. Stanly, her attorney at law and legal adviser, and Stephen W. Purington, her general business manager and agent, as trustees. To arrive at a proper solution of this question, it will be necessary, among other things, to determine (1) whether the conveyances were executed in violation of section 1313 of the Civil Code of California, which makes void any attempt of a person to give, by will, more than one-third of his estate to charitable uses; (2) whether Catherine M. Garcelon had the mental capacity to comprehend the character and extent of her property and to make the conveyances; (3) whether the conveyances were obtained from her by undue influence or fraud.

It will become necessary, in reviewing the questions of fact, to consider all the circumstances and surroundings of the respective parties. The testimony of the witnesses covered a wide range, and opened up a broad field for the study of human nature in all of its phases and essential characteristics. The reasons for the conclusions reached by the court cannot very well be crystallized, by brevity of expression, into the limited space of an ordinary judicial opinion. Many of the minor details of the evidence will not be noticed at all. Others will only be generally stated. It will, however, be essential to refer, in a review upon the most important questions, to the lives, history, and character of some of the persons who figure so prominently in the transactions involved in this litigation. In the outset it is proper to state that the witnesses were, as a rule, intelligent, many of them being people of extensive business experience and knowledge, men and women of probity and strength of character. Many of them were the relatives or close friends of the family of Dr. Merritt and Mrs. Garcelon, and frequent visitors at their home. Their character and credibility, with perhaps two or three exceptions, were unimpeached, and stand unquestioned. One noticeable feature must be mentioned: Many of the witnesses who appeared on behalf of the defendants were, more or less, in personal feeling at least, interested in the result of this litigation. Several of them had not received as much from Mrs. Garcelon as they expected. Some of the witnesses who appeared on behalf of the complainants were also beneficiaries in the trust, and were satisfied with what they had received, and felt grateful for the kind remembrances of Mrs. Garcelon. The interested feeling of many of the witnesses was plainly discernible by the court, and in several instances human nature plainly manifested itself. There were also several witnesses on the respective sides that were not in any manner interested either way.

1. Are the conveyances a fraud upon, and a violation by indirection of, section 1313 of the Civil Code of California?

This section reads as follows:

"No estate, real or personal, shall be bequeathed or devised to any charitable or benevolent society, or corporation, or to any person or persons in trust for charitable uses, except the same be done by will duly executed at least thirty days before the decease of the testator; and if so made, at least thirty days prior to such death, such devise or legacy, and each of them, shall be valid; provided, that no such devises or bequests shall collectively exceed one-third of the estate of the testator leaving legal heirs, and in such case a pro rata deduction from such devises or bequests shall be made so as to reduce the aggregate thereof to one-third of such estate; and all dispositions of property made contrary hereto shall be void, and go to the residuary legatee or devisee, next of kin, or heirs according to law."

The defendant's contention is that the documents in question were ambulatory, revocable at the will and pleasure of Mrs. Garcelon during her life, and that it was not intended they should take effect, so far as she was concerned, until after her death, and that these conditions make the documents a will, and not a deed. This question must be determined from the language of the instruments, aided by the surrounding facts, and the circumstances and conditions of the respective parties at the time of their execution.

The statute in question does not apply to every disposition of property. It is evident, from a careful reading of its provisions, that it is limited in its application to "devises or bequests" of property by will. It does not apply to deeds. Every person, having the mental capacity, and being free from debts and personal obligations, has the unquestioned right to convey and dispose of his property by deed as he pleases, and his acts in so doing cannot be set aside if the transaction is free from fraud and undue influence. What is the essential difference between a deed and a will?   A deed must pass a present interest in the property, although the right to possession and enjoyment may not accrue until some future time.   An instrument which does not pass any interest until after the death of the maker is a will.   Nichols v. Emery (Cal.) 41 Pac. 1089; Craven v. Winter, 38 Iowa, 478; Spencer v. Robbins, 106 Ind. 580, 5 N. E. 726; Kopp v. Gunther, 95 Cal. 64, 30 Pac. 301; Diefendorf v. Diefendorf, 132 N. Y. 100, 30 N. E. 375; Chrisman v. Wyatt (Tex. Civ. App.) 26 S. W. 759; Jenkins v. Adcock (Tex. Civ. App.) 27 S. W. 21; Bunch v. Nicks, 50 Ark. 367, 378, 7 S. W. 563; Bromley v. Mitchell, 155 Mass. 509, 30 N. E. 83; Mowry v. Heney, 86 Cal. 475, 25 Pac. 17; Book v. Book, 104 Pa. St. 240; McGuire v. Bank, 42 Ala. 591; Hall v. Burkham, 59 Ala. 349, 354; Owen v. Smith, 91 Ga. 568, 18 S. E. 527.

In Craven v. Winter the court said:

"A rule recognized by this court, which seems to have the united support of the authorities, furnishes an unerring test to determine the character of the instrument. It is this: 'If the instrument passes a present interest, although the right to its possession and enjoyment may not occur till some future time, it is a deed or contract; but, if the instrument does not pass an interest or right till the death of the maker, it is a will or testamentary paper.' University v. Barrett, 22 Iowa, 72."

The instrument in question purports to be a deed. Its language is that ordinarily used in deeds. By its terms it passes a present interest in the property therein mentioned to the trustees therein

named. It was executed and acknowledged as a deed, and delivered to the trustees as such. It is a deed.

But it is further argued by the defendants that the intention of the parties was to make a will, and that the documents were put into the form of a trust deed for the express purpose of evading the provisions of section 1313, and this argument is sought to be upheld upon the grounds, among others, that Mrs. Garcelon, after the signing of the papers, continued, through her agent, Stephen W. Purington, to manage the property as long as she lived, that she at all times treated the property as her own, that in mentioning the fact of the execution of the documents she spoke of it frequently as her will, that the transaction was a gift by Mrs. Garcelon to take effect at her death, that it was revocable during her life, and that duplicates of the documents were never delivered to the trustees. The testimony shows, without contradiction, that the original instruments were delivered to and kept by John A. Stanly in his safe. It is therefore immaterial what was done with the duplicates, and the fact that they were taken by Stephen W. Purington, and were kept by him in Mrs. Garcelon's safe-deposit box until after her death, does not in any manner destroy or contradict the evidence as to the delivery of the originals, as will hereafter be shown.

It is claimed by the complainants that the deed of trust only contains a limited power of revocation, in this: that it only refers to the provisions in favor of the relatives and friends who are beneficiaries in the trust, and does not apply to the charities which are the real subject of this controversy. The document itself would seem to sustain this construction. The clause as to the right of revocation reads as follows:

"The party of the first part hereto reserves to herself the power of revocation, or of modification, or of substitution of any or of all of the trusts hereinbefore declared, such revocation, modification, or substitution to be made within such fifteen years, and to be made by her by a paper writing by her executed."

There is nothing "hereinbefore declared" in the instrument which relates to the gifts to charities. The nephews, before instituting their attack upon the deed, signed a contract to maintain and keep inviolate the other gifts made in the deed. Other testimony might be referred to which strongly tends to support the position contended for by complainants. But it is unnecessary to determine the question as to whether or not the revocation applies to the charities. Conceding, for the purpose of this opinion, that the revocation does apply to the charities, it does not destroy the character of the document as a deed, for no revocation was ever made. Jones v. Clifton, 101 U. S. 225, 229; Nichols v. Emery, supra; Hellman v. McWilliams, 70 Cal. 449, 453, 11 Pac. 659; Von Hesse v. MacKaye, 136 N. Y. 114, 119, 32 N. E. 615; Hall v. Burkham, 59 Ala. 349.

Several of the questions raised by defendant's counsel are disposed of by the decision of the court in Nichols v. Emery, where a father conveyed property to his son as trustee by a deed which

provided that the trustee should sell the property within 10 months after the grantor's death and divide the proceeds among his children. The power of revoking the trust was expressly reserved. The trustee did not take possession of the property until after the death of his father. The father, during his lifetime, retained the possession of the property from the date of his deed to the time of his death. He farmed the place, took all of its revenues, offered the property for sale, and paid all the taxes thereon. The court held that the instrument was a valid express trust, passing a present interest, subject to divestiture only by revocation, though the enjoyment of such interest was to commence in the future. In the course of the opinion the court said:

"By the terms of the instrument, an estate was assuredly conveyed to the trustee. The language is appropriate to a conveyance, and the grantor's execution and delivery of the deed (both found), he being under no disability and impelled by no fraud, operated to vest so much of his estate in the trustee as was necessary to carry out the purpose of the trust. The especial purpose was to sell and distribute the proceeds upon his death,—a legal purpose, authorized by section 857 of the Civil Code. The term of the duration of the trust—the life of the settler—did not violate the provisions of section 715 of the same Code. We have, therefore, an estate conveyed to a named trustee, for named beneficiaries, for a legal purpose and a legal term,—such a trust as conforms, in all its essentials, to the statutory requirements. That no disposition is made by the trust of the interest and estate intervening in time and enjoyment between the dates of the deed and the death of the settler cannot affect the trust. The trustee takes the whole estate necessary for the purposes of the trust. All else remains in the grantor. Civ. Code, § 866. In this case there remained in the grantor the equivalent of a life estate during his own life, and he was thus entitled to remain in possession of the land, or lease it and retain the profits. Nor did the fact that the settler reserved the power to revoke the trust operate to destroy it, or change its character. He had the right to make the reservation. Id. § 2280. But the trust remained operative and absolute until the right was exercised in proper mode. Stone v. Hackett, 12 Gray, 232; Van Cott v. Prentice, 104 N. Y. 45, 10 N. E. 257. * * * The fact that he reserved the right to revoke did not impair the trust, nor affect its character, since title and interest vested, subject to divestiture only by revocation, and, if no revocation was made, they became absolute. A man may desire to make disposition of his property in his lifetime to avoid administration of his estate after death. Indeed, in view of the fact, both patent and painful, that the fiercest and most extensive litigation, engendering the bitterest feelings, springs up over wills, such a desire is not unnatural. And when it is given legal expression, as by gifts absolute during life, or by gifts in trust during life, or voluntary settlements, there is manifest, not only an absence of testamentary intent, but an absolute hostility to such an intent."

It is true that Mrs. Garcelon's idea, at the inception, was to make a will; but, when the matter was fully explained to her, she directed that the disposition of her property should be made by deed. It is also true that Mrs. Garcelon, during her lifetime, spoke of the trust papers as her will. The declarations of a party to an instrument, whether before or after its execution, are generally inadmissible in evidence, either to support or to destroy the validity of the instrument or to control its construction. Linton's Appeal, 104 Pa. St. 228, 238; Garlick v. Bowers, 66 Cal. 122, 4 Pac. 1138; Mowry v. Heney, 86 Cal. 471, 476, 25 Pac. 17; Kitchell v. Beach, 35 N. J. Eq. 446, 454; Mooney v. Olsen, 22 Kan. 69, 76; Caemen v. Van Harke,

33 Kan. 333, 338, 6 Pac. 620; Robinson v. Brewster, 140 Ill. 649, 30 N. E. 683.

Mr. Devlin, in his work on Deeds (section 284), says:

"Whether a deed passes the title or not must be determined by its legal effect. If it has been executed and delivered, its effect is determined by its language. When so executed and delivered, its legal effect, as to the passing of the title, is not altered by the fact that one object of the transaction was to save the expense and trouble of administration upon the grantor's estate after his death; and, where a grantor executed a deed for this purpose to his wife, the fact that she had placed the deed, after delivery, where her husband, equally with herself, could have access to it, does not change its legal effect as a conveyance."

Again: "Whether a deed has been delivered or not is a question of fact, upon which, from the very nature of the case, parol evidence is admissible. But whether a deed, when delivered, shall take effect absolutely, or only upon the performance of some condition not expressed therein, cannot be determined by parol evidence. To allow a deed absolute upon its face to be avoided by such evidence would be a dangerous violation of a cardinal rule of evidence. The deed in this case, being absolute upon its face, and having been delivered to the grantee himself, took effect at once. It could not have been delivered to take effect upon the happening of a future contingency, for this would be inconsistent with the terms of the instrument itself. Without regard, therefore, to any understanding which may have existed between the parties at the time the deed was delivered, it must be held as an absolute conveyance, operative from that time." Section 314; Mowry v. Heney, 86 Cal. 471, 476, 25 Pac. 17.

Section 1313 is essentially different in its provisions from the English mortmain act that was construed in Jeffries v. Alexander, 8 H. L. Cas. 594, which is the leading case relied upon by defendants. Under that act, the disposition of gifts of property to charitable uses could only be made by deed. Under section 1313 it can be made in any manner, except by will, when it is limited to one-third of the property. There the disposition was not made by deed, and, inasmuch as it was not in the prescribed manner, it was held invalid. In the present case, the disposition was not made in the prohibited way.

Several authorities were cited by the defendants as to the duty of courts in construing statutes so as not to defeat their object, and special reliance is placed upon the language found in 23 Am. & Eng. Enc. Law, 472, with reference to evasions of a statute, where it is said:

"To carry out effectually the purpose of a statute, it must be so construed as to defeat all attempts to do or avoid in an indirect or circuitous manner that which it has prohibited or enjoined. Courts must labor to suppress all subtle inventions and circumlocution by which the object and purpose of the law will be defeated."

This principle, in the application to the cases to which it refers, no one denies. But, immediately following the text as quoted by counsel, comes the qualification, which should not be overlooked by the courts:

"It is, however, essential not to confound what is actually or virtually prohibited or enjoined by the language with what is really beyond the contemplation, though it be within the policy, of the act; for it is only to the former case that the principle under consideration applies."

If the construction contended for by defendants should prevail, then no person in California could ever give more than one-third of his property to charitable uses, because he is prohibited from so doing by will; for, if he makes a disposition in any other manner, it would, according to their argument, be done for the purpose of evading the statute. My conclusion is that the instruments were not executed in fraud or in violation of the statute, and that the disposition of the property for charitable purposes was by deed, which is not prohibited by any of the provisions of the Code.

2. Did Mrs. Garcelon have the mental capacity to make the conveyances?

Mrs. Garcelon, after her husband's death, was the manager of Dr. Merritt's household affairs, and received a monthly allowance from him for the expenses thereof. She had no other matters to attend to. Her duties in this position were congenial to her tastes. Her life was a peaceable and quiet one. After Dr. Merritt's death, she continued her household duties. The property of the estate left her by Dr. Merritt's will was managed by her agent, Stephen W. Purington. At the time of the execution of the deed, Mrs. Garcelon was over 76 years old. She had the feebleness natural to age. She was physically weak, and was suffering more or less with neuralgia, pains in her head, and during the day she spent much of her time lying upon a sofa. When she went out, she had occasionally to be assisted into her carriage. But at the time of the execution of the papers, before and after that time, and up to within a few weeks of her death, which occurred December 29, 1891, about nine months after the documents were signed, she managed and controlled all her household affairs, did all the marketing for the house, and personally attended to the repairs thereof. She was not an invalid. Some of the witnesses testified that "she used to get around very lively," and walked up and down the stairs without assistance.

But it is not the bodily sufferings, as an independent proposition, with which we have to deal. Mere physical weakness does not necessarily affect the mental capacity. Bodily ailments, however severe, which do not affect the mental capacity to such an extent as to unfit the person from atending to ordinary business, or comprehending the ordinary relations of his affairs or his duty to society, furnish no ground for setting aside a conveyance. "It is not a question of physical condition, of pain or absence of pain, of long life or short life, but it is a question of mental capacity and the free and untrammeled action of the mind." Carty v. Connolly, 91 Cal. 15, 20, 27 Pac. 599: Rothrock v. Rothrock, 22 Or. 551, 30 Pac. 453; Ayres v. Ayres, 43 N. J. Eq. 565, 12 Atl. 621; King v. Humphreys, 138 Pa. St. 310, 315, 22 Atl. 19; Brown v. Riggin, 94 Ill. 561, 565; In re Boyer's Estate (Pa. Sup.) 31 Atl. 359, 366. Old age alone will not disqualify a person from executing deeds, if he is in possession of his mental faculties. Every person, whatever his age may be, can freely execute conveyances. It is not the soundness of the body, but of the mind, that is requisite to sustain the execution of instruments. The law looks only to the competency of the under-

standing; and neither age, nor sickness, nor extreme distress, nor debility of body, will affect the capacity to make a conveyance, if sufficient intelligence remains. Van Alst v. Hunter, 5 Johns. Ch. 158; Rutherford v. Morris, 77 Ill. 397, 408; Waddington v. Buzby, 45 N. J. Eq. 173, 16 Atl. 690; Horn v. Pullman, 72 N. Y. 269, 276; Kerr v. Lunsford, 31 W. Va. 661, 686, 8 S. E. 493; Buckey v. Buckey, 38 W. Va. 168, 176, 18 S. E. 383; Wilson v. Mitchell, 101 Pa. St. 495, 503; Nace v. Boyer, 30 Pa. St. 99; Thompson v. Kyner, 65 Pa. St. 368, 378; Soberanes v. Soberanes, 97 Cal. 141, 146, 31 Pac. 910; Leeper v. Taylor, 47 Ala. 221; Guild v. Hull, 127 Ill. 525, 534, 20 N. E. 665; Francis v. Wilkinson, 147 Ill. 370, 381, 35 N. E. 150; Chrisman v. Chrisman, 16 Or. 127, 138, 18 Pac. 6.

With reference to Mrs. Garcelon's mental condition, the witnesses on behalf of the defendants, members of her household and intimate friends, testified that her memory was very weak, and that her mind was not strong; that she was forgetful; that at times she did not seem to have any strength of will or body; that she was almost continually taking medicines, among them large quantities of antipyrene and phenacetine. The instances of her weak memory and mind and her forgetfulness were stated to be that she could not carry on a conversation for any length of time on the same subject; that she would ask the same questions over and over; that she would order things, and then forget what she had ordered; that on her drives around town in her carriage she would not always recognize her friends,—"she would, and then again she would not"; that she would purchase produce at the markets, pay for the same, and, after a short time, would have the coachman drive back, and she would offer to pay for the same again. The coachman said:

"She would go and order, and pay mostly cash, except at the butcher's. The butcher ran a monthly bill, but those other stores she paid for the things, and she would order something, and pay for it, and then she would talk a little while, and want to pay again."

Another statement of the coachman was:

"She asked me whose place that was, and I told her it belonged to a man by the name of Merrill, and I went on and told her, as I heard, how he got his money, * * * and we went on a block or two further, * * * and she said she guessed we would turn around and come home, and we came right by the same house, and she asked me whose place that was, not ten or fifteen minutes after I had told her the whole story about it."

Capt. Frank Purinton thought her memory was poor, for one thing, because—

"She would tell some little incident that happened in her younger days, and perhaps in a little while something would be spoken of that would lead her to that again, and she would tell it again. Sometimes, for the fun of the thing, I would lead her up to it, and she would tell it the third time, perhaps, within an hour and a half."

These incidents were: One of being kicked by a horse when she was a child, one of seeing and being frightened at Indians crossing the river with their boats as she was coming from school, one of burning bird's-eye maple for fuel, and one of laying in provisions for winter, packing spare ribs in the snow. One witness thought

she was foolish and childish, because she was very fond of dress, and gave it as her opinion that "any old woman, of seventy-nine or eighty years of age, that would talk of dress as much as she did, I don't think had good sense." Another reason given is that she was constantly taking stimulants, wines, and medicines; that she would sometimes take the wrong medicine; that she did not know and could not state the names, ages, or residence of all her collateral relatives; that she did not seem to comprehend the nature, character, and extent of her property, and did not have the capacity at once to understand how much one thousand times two thousand was, but she could be educated in detail, and had plenty of capacity to understand what it was, if educated up to it. These are but a few of the instances given by the witnesses for their belief that Mrs. Garcelon was of weak mind, poor memory, and forgetfulness; but they fairly illustrate the general character of the testimony.

On the other hand, the witnesses on behalf of the complainants testify that she was of sound mind and memory, that they never noticed anything wrong about her mental condition, that she was mentally as bright as ladies of her age are, and that they never perceived any mental failure until a few weeks before her death. Dr. Adams testified that she had neuralgia of the superficial muscles of the neck, but that under ordinary circumstances this would not affect her mind; that the medicines, with the quantities she took, would not have any tendency to affect her mind at all; and that "she was a lady of general intelligence, well informed for a lady of her age." It was also shown that the medicines were nearly always given to her by an inmate of the house. Dr. Southard said: "So far as I observed, I found that she was physically feeble, but mentally she seemed in her ordinary normal condition. I could see nothing that pointed to any mental disturbance. She was clear in intellect, and spoke of all these memories of old times with perfect clearness and without hesitation,—drifted from one little thing to another in a natural way." Capt. Simpson, who had known her for many years, said that she "always appeared exceedingly sound, other than that she showed signs of age, and complained of physical debility, like old people, neuralgia or headache, or something; but as to the soundness of mind, I never saw anything out of the way in any way. If there was anything, she very shrewdly concealed it from me. I never saw it." Henry Rogers, who was for many years in the employ of Dr. Merritt as confidential agent in managing his property, said: "I think she was perfectly sound mentally. I think she had a strong mind and a clear head." Capt. Knowles, the trustee in the trust deed for the benefit of the nephews James P. and Harry Merritt, said: "Well, if she was not a clear-headed, sound-minded woman, I don't know where there is one. * * * Her memory was good." Mrs. Gordon, daughter of Capt. Knowles, and intimate friend of Mrs. Garcelon, a frequent visitor at her house during her lifetime, and a beneficiary in the trust deed, said that Mrs. Garcelon mentally was "an unusually bright, strong woman." And blunt old Capt. McIntyre said: "She was a good, sound, straightforward woman." John A. Stanly, in reply to questions as to

whether she understood the instrument, said: "She appeared to understand it, and she certainly had the mental capacity to understand each and every one of them just as fully and thoroughly as any layman could possibly do." Several of the witnesses introduced upon the part of the defendants indorsed the statements of the complainants' witnesses as to the soundness of her mind and the good condition of her memory. Mr. Taber said that her memory "was fair for a lady of her age." The dressmaker, Mrs. Wiand, told Henry Rogers that she considered Mrs. Garcelon "perfectly sane, only very forgetful and weak."

In connection with this testimony, the authorities will be examined. It may be said that several of the cases already cited, and a majority of others that will be referred to, relate to the execution of wills, instead of deeds, and that it requires a higher degree of mental capacity to sustain a deed than a will. Be that as it may, the cases referred to have more or less application to the direct points herein relied upon, and clearly show the trend of judicial minds upon the question of capacity. The fact is that more cases are found in the books with reference to the capacity of the testators in wills than of grantors in deeds, but that fact does not deprive them of authority touching the matters under review. Moreover, several of the authorities relate especially to the capacity necessary to sustain the execution of deeds. It is doubtless true, as claimed by defendants, that Mrs. Garcelon did not, at the time of the execution of the trust deed, have actual knowledge of the extent and character of each piece of real estate or kind of personal property of which she was possessed. She was informed generally of its value, but did not actually know where all of it was located or its condition. There is, however, a clear and well-defined distinction between the actual knowledge of a thing, and the capacity to understand such a thing. In Brown v. Mitchell, 75 Tex. 10, 16, 12 S. W. 606, the court said:

"There is no doubt that capacity to understand the nature and extent of the property disposed of by will must exist at the time a will is made, but it is not true that actual knowledge or understanding of the extent and nature of property disposed of by will is necessary to the validity of such a disposition. * * * If actual knowledge or understanding of the nature and extent of property devised was necessary to the validity of a will, but few wills by which considerable estates are disposed of would be valid. The question is one of capacity to know, and not of actual knowledge, and the want of the latter cannot be made the test of the existence of the other."

But it is said that Mrs. Garcelon was forgetful, and that she could not recollect the names of all her collateral relatives. Who can? Is this strange or unusual? How many people living on the Pacific coast who have arrived at the age of 50 years or more can remember their collateral relatives, and give their names and addresses? If this knowledge is a necessary test in order to establish capacity, how many deeds and wills of people otherwise absolutely sound in mind and memory could be set aside? Would not the difficulty be to find any that could be sustained? One of the witnesses, who testified to Mrs. Garcelon's forgetfulness in this respect, and who seemed to be impressed with the idea that this

was a fact which tended to establish her weak and failing memory, upon cross-examination was asked, "How many collateral relatives have you?" He hesitated awhile, and then said, "About forty." When asked to name them, he could name but two, and was not positive that he had over twenty. The truth is that Mrs. Garcelon was aided by some relatives who had recently come from Maine, who, among other things, conducted a correspondence of inquiry to find her relatives, and, after all their efforts, they did not find a dozen or more that have since appeared, and who were perhaps equally as much or more entitled to her bounty than several who were kindly remembered. The surprise is, if there is any, that she should have ascertained the names of so many, not that she should have failed to obtain the names of a few.

The entire testimony as to the forgetfulnes of Mrs. Garcelon in failing to give the names of all her collateral relatives is too remote and conjectural to be applied as a test of mental capacity. In Spratt v. Spratt, 76 Mich. 384, 43 N. W. 627, the court said:

"It is not required that a testator should know and understand the number and condition of his relatives, nor their relative claims upon his bounty, nor that he should know and understand the reason for giving or withholding his bounty as to any and every relative."

The other acts of forgetfulness are of less weight, and do not march up to the standard of judicial reason as a test to establish capacity. How many people, young as well as old, have habits and ways of forgetfulness? It is a trait of human character, different in different people. Most men in active life, of sound mind and strict business habits, have traits of forgetfulness. Especially is this true of professional men. It would serve no useful purpose to mention illustrations outside of the books. They are common and known to everybody. In Buckey v. Buckey, supra, it was shown by the testimony that the testator, on one occasion, was found cutting weeds on the opposite side of the street from his house, seeming not to know it, and, when his attention was called to it, he at once returned across the street. Sometimes he bade a colored woman living in his house good-by, saying he was going to Frederick City, and then he would go directly to the tanyard in the town where he lived, and return. At times he told her, when it was raining, to take the doors from the outhouses, so that they would not get wet. These circumstances were certainly as peculiar, and the conduct as strange, as any of the acts testified to about Mrs. Garcelon; but in that case, notwithstanding the eccentricities of the testator, there was plenty of evidence to show good sense, intelligent conversation, and discrimination upon the part of the testator, and the court said:

"The strange actions just mentioned do not go far enough. They do not drown the excellent intelligence and common sense * * * which characterized his long life. They do not deprive this sensible, worthy man of the right to bestow his property as he wished."

In Horn v. Pullman, 72 N. Y. 274, the testator had infirmities incident to old age, and was often obliged to resort to medical assistance. His sight and memory were considerably impaired, and for a

year or two before his death he would repeat questions, sometimes two or three times during the same conversation. He did not always recognize persons with whom he was acquainted, and had to be told who they were. The court said, in speaking of the testimony:

"It does show impaired mental and bodily powers, but it falls short of establishing that the testator did not understand his relation to his children and others, the condition of his property, and the nature and effect of a testamentary act."

Justice Washington's charge to the jury in Stevens v. Vancleve, 4 Wash. C. C. 262, Fed. Cas. No. 13,412, contains as correct a statement as to what constitutes sufficient competency to make a will as is found in the books, and this charge has been frequently referred to as containing a correct exposition of the question of mental capacity. Upon this question he said:

"He must, in the language of the law, be possessed of a sound and disposing mind and memory. He must have memory. A man in whom this faculty is totally extinguished cannot be said to possess understanding to any degree whatever, or for any purpose. But his memory may be very imperfect. It may be greatly impaired by age or disease. He may not be able at all times to recollect the names, the persons, or the families of those with whom he had been intimately acquainted, and may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory, and vigor of intellect, to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. * * * The question is not so much what was the degree of memory possessed by the testator as this: Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the object of his bounty? To sum up the whole in the most simple and intelligent form: Were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time when he executed his will? * * * The only point of time to be looked at by the jury, at which the capacity of the testator is to be tested, is that when the will was executed. He may have been incapable to make a will at any time before or after that period, and the law permits evidence of such prior and subsequent incapacity to be given. But, unless it bear upon that period, and is of such a nature as to show incompetency when the will was executed, it amounts to nothing."

See, also, Clifton v. Clifton, 47 N. J. Eq. 228, 241, 21 Atl. 333; White v. Starr, 47 N. J. Eq. 244, 258, 20 Atl. 875; Bennett v. Bennett, 50 N. J. Eq. 439, 445, 26 Atl. 573; Lee's Case, 46 N. J. Eq. 193, 201, 18 Atl. 525; Chrisman v. Chrisman, 16 Or. 127, 137, 18 Pac. 6; Eastis v. Montgomery, 95 Ala. 486, 11 South. 204; Wilson v. Mitchell, 101 Pa. St. 495, 502; Hovey v. Chase, 52 Me. 305, 316; Rusling v. Rusling, 36 N. J. Eq. 607; Burt v. Quisenberry, 132 Ill. 386, 394, 24 N. E. 622; In re Hall's Will (Surr.) 24 N. Y. Supp. 864; Horne v. Horne, 9 Ired. 99, 106; Moffit v. Witherspoon, 10 Ired. 185, 191; Brinkman v. Rueggesick, 71 Mo. 553; Francis v. Wilkinson, 147 Ill. 378, 35 N. E. 150; Carter v. Dixon, 69 Ga. 82, 89; Wilkinson v. Sherman, 45 N. J. Eq. 413, 18 Atl. 228; Hoban v. Piquette, 52 Mich. 346, 17 N. W. 797; Taylor v. Cox, 153 Ill. 220, 225, 38 N. E. 656; Knox v. Knox, 95 Ala. 495, 503, 11 South. 125.

In 1 Devl. Deeds, § 68, the author says:

"But, although it may be uncertain that the mind of the grantor was in all respects sound, still, if he has sufficient ability to execute and deliver a deed, understanding the consideration that he is to receive, and the nature of the transaction in transferring his title to another, it is considered that his mind is sufficiently sound to render his deed valid."

After an examination of all the authorities cited by the respective counsel, and a careful consideration and review of all the evidence upon this point, with all the pros and cons, the mind of the court is irresistibly led to the conclusion that Mrs. Garcelon was of sound mind and disposing memory, and that she had sufficient mental capacity to execute any deed or other document. The testimony is overwhelmingly in favor of this conclusion. In all of her many business transactions she exercised intelligence and sound judgment and discretion. Her mental capacity was certainly equal to, if not far above, the average people of her age, and was much stronger than that of many of the persons declared to be sufficient in several of the authorities which have been referred to.

3. Were the conveyances in question obtained from Mrs. Garcelon by fraud or undue influence?

Before proceeding to notice the specific points relied upon by defendants to establish the affirmative of this proposition, or to review the evidence bearing in any manner upon this question, it is deemed proper, first, to ascertain generally what constitutes undue influence sufficient to authorize the court to annul a conveyance. In Conley v. Nailor, 118 U. S. 127, 134, 6 Sup. Ct. 1005, the court said:

"The next and last ground alleged for annulling the deeds is that Nailor was induced to make them by the fraud and undue influence of the defendant. The ground upon which courts of equity grant relief in such cases is that one party, by improper means and practices, has gained an unconscionable advantage over another. The undue influence for which a will or deed will be annulled must be such as that the party making it has no free will, but stands in vinculis. 'It must amount to force or coercion, destroying free agency.' Stulz v. Schaeffle, 16 Jur. 909. See, also, Williams v. Goude, 1 Hagg. Ecc. 577; Armstrong v. Huddleston, 1 Moore, P. C. 478. In Eckert v. Flowry, 43 Pa. St. 46, it was said by Strong, J.: 'Now, that is undue influence which amounts to constraint, which substitutes the will of another for that of the testator. It may be either through threats or fraud, but, however exercised, it must, in order to avoid a will, destroy the free agency of the testator at the time when the instrument is made.' The rule upon this subject was thus stated in Davis v. Calvert, 5 Gill & J. 269, 302: 'A testator shall enjoy full liberty and freedom in the making of his will and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it.'"

Substantially the same views were again expressed by the same court in Mackall v. Mackall, 135 U. S. 167, 172, 10 Sup. Ct. 705; and are to be found in many decisions. Bulger v. Ross, 98 Ala. 267, 270, 12 South. 803; McDaniel v. Crosby, 19 Ark. 533, 551; McCulloch v. Campbell, 49 Ark. 367, 371, 5 S. W. 590; Goodwin v. Goodwin, 59 Cal. 562; In re Langford's Estate, 108 Cal. 609, 41 Pac. 701; Rutherford v. Morris, 77 Ill. 398, 412; Sturtevant v. Sturte-

vant, 116 Ill. 340, 354, 6 N. E. 428; Schmidt v. Schmidt, 47 Minn. 451, 457, 50 N. W. 598; Society v. Loveridge, 70 N. Y. 387, 394; 1 Devl. Deeds, § 84; Brick v. Brick, 43 N. J. Eq. 167, 10 Atl. 869; Knox v. Knox, 95 Ala. 495, 503, 11 South. 125.

The oral evidence in this case must be considered, weighed, and measured by these rules in order to enable the court to determine whether or not Mrs. Garcelon was induced to execute the instruments by the undue influence of the trustees, Stephen W. Purington and John A. Stanly, or either of them. Upon this question, as well as others, the life, history, acts, motives, and general conduct of Mrs. Garcelon is to be kept constantly in view. Her physical condition, feebleness, and weakness of body, and the state of her mind must not be overlooked. All of her surroundings, with the heavy burdens and duties imposed upon her by the provisions of Dr. Merritt's will, her relation with her relatives, and her desires and wishes concerning the disposition to be made of the vast property left to her. It is the duty of the court, under the legal principles hereinbefore announced, to especially look at and consider what the facts are which existed at the time of the execution of the instrument sought to be set aside. With these general comments the testimony relative to the alleged undue influence of Stephen W. Purington and John A. Stanly will be reviewed.

Stephen W. Purington was a relative of the family. He had lived in the house as Dr. Merritt's confidential friend and agent, and was manager of his property and business affairs for a few years before the doctor's death, and thereafter he continued in the same relation for Mrs. Garcelon up to her death. He was about 60 years of age, —a crusty, penurious old bachelor. He was exceedingly economical and close in money matters; was perfectly satisfied with his salary of $125 per month; was constantly endeavoring to decrease expenses and increase the revenues of the estate. He was loyal to his employers, a faithful manager of their property, a trusted friend, and an honest man. Was Mrs. Garcelon under the fear and subject to the mental subordination of Stephen W. Purington? Was she at all times controlled by him? Some of the witnesses seem, no doubt, conscientiously and honestly, to entertain this opinion. Mrs. Dargie testifies that Mrs. Garcelon did not seem to be mistress of her own house; that "she was afraid of Mr. Purington"; that "she was well under subjection. * * * I think Mr. Purington had her pretty well under his thumb." Mrs. Wiand gives a conversation with Mrs. Garcelon about money matters, and testifies that Mrs. Garcelon said: "I have to be a little cautious about drawing money. I have Stephen, —he finds a great deal of fault with my drawing money so much, and I have to be a little careful." And from this and other conversations the witness said that Mrs. Garcelon seemed "to be governed altogether by the advice of Mr. Purington." Several of the witnesses testified that Mrs. Garcelon never wanted to talk about the boys— the nephews—when Stephen was present; that Stephen did not favor the boys; and that Mrs. Garcelon always, when not in his presence, spoke kindly of them. Stephen Merritt (father of Harry P.) testifies that he had a conversation with Mrs. Garcelon in which she said:

" 'What do you think? Fred wants to borrow $1,600 of me, and did not want to let Steve know.' She said, 'I told him that I could not do that, but I would let him know the next day.' I asked her, 'Did you let Fred have the money?' She shook her head, and said, 'No; Stephen would not listen to it.' She often would say, 'I don't know what I should do if it was not for Stephen. If anything should happen to Stephen I don't know what I should do.' "

Mrs. Mary T. Purinton (wife of Capt. Frank), in reply to the question, "What was the attitude or bearing of Mrs. Garcelon towards Stephen Purington?" said, "I thought she was a little afraid of him when it came to money." The instances she gave for her belief were to the effect that, when Mrs. Garcelon bought things, she would say, "Don't tell Stephen, because he will think I am extravagant;" that when she gave money to the cook or coachman, she would say, "Don't say anything to Stephen, because he thinks they are more than paid now." When one of the carriage horses was sick, a veterinary surgeon was called in to treat him, and when the bill for services was presented "Stephen thought it was dreadful to pay it,—thought it was extravagant." At another time, when the horse was sick, Mrs. Garcelon sent for the surgeon, but said, "Don't say anything to Stephen, because he will think it is money thrown away." This witness mentions other things indicative of Stephen's gruff manner and penurious habits,—"once, at the table, when he sat down, he thought it was rather extravagant to have two turkeys; and at another time, at supper, among other things, we had a beefsteak, and no one touched it, and he thought it was rather extravagant to buy the best of beefsteak to feed Chinamen on." His manner was gruff, but Mrs. Garcelon "never took any notice, except to look up at my husband, who sat opposite to her, and wink both eyes at him," and afterwards said, "Stephen is peculiar."

One other incident, alluded to by this witness, will be noticed. On one occasion, in her presence and in the presence of Mrs. Eleanor Purington, Stephen came into the room, and said:

" 'Didn't you say you wanted some money. Mrs. Garcelon?' She says, 'Yes, Stephen.' He says, 'How much do you want?' And she says, 'A couple of hundred will do me.' And Mrs. Purington speaks up, and says, 'A couple of hundred will do me, too.' I says, 'If you are supplying the ladies with money, I will take a couple hundred, to.' And he says, 'It is as much as I can do to supply Mrs. Garcelon with money. It is like pouring it down a rat hole, giving it to her.' "

This was said, as the witness thought, in an insulting and indignant manner.

Mrs. Eleanor Purington was more positive and emphatic as to what she would have done if she had been in Mrs. Garcelon's place. After Mrs. Frank Purinton and Stephen had left the room, this witness said:

" 'Mrs. Garcelon, why do you allow Stephen to speak that way to you?' She said, 'Oh, Nellie, that is just his way of speaking.' I said, 'I think he is very impertinent. If I were you, * * * and Stephen Purington spoke that way to me, and he was my man of business, he would not speak that way to me the second time. He would get his walking papers right then and there.' To all this Mrs. Garcelon simply replied, 'Oh, Stephen Purington don't mean anything.' "

The witness continuing said:

"I considered he was very impertinent, dictatorial, and overbearing to Mrs. Garcelon. It was no way for him to speak to her, and, had I been Mrs. Garcelon, he would have left right then and there. The Court: No mistake about that? A. No, sir."

This witness further testified:

That she did "not consider Mrs. Garcelon a firm woman, but a stubborn woman. * * * If you talked nicely to her, and had a pleasant, nice way, you could induce Mrs. Garcelon to do a great deal. But if you bossed,— not bossed her, exactly— The Court: Tried to pry into her business? A. Yes; and wanted to advise her, and say so and so, and so and so, she would not take it. * * * Q. Could any one influence Mrs. Garcelon? A. If they could do it in the right way, they could; * * * being pleasant and deferential to her: 'Don't you think it would be nice?' 'Don't you think it would be the way to do?'—a little flattery; a little delicate attention."

These and other witnesses thought that Stephen had his own way in everything. This was an honest mistake on their part. They did not know Stephen as well as Mrs. Garcelon did. The record shows that she knew him well, confided in and trusted him. He was her right-hand man. She did not know how she could get along without him. She knew his ways,—that he was very economical in money matters, and somewhat peculiar about many things, gruff and unpleasant, at times; but she never paid any attention to these eccentricities. She knew, with all his faults, if faults they were, that he could be trusted; that he was at all times faithful to her; and that he was an honest and absolutely reliable, conscientious man. This is why she let Stephen have his own way in many things. It was often convenient for her so to do, especially in regard to money matters. As a matter of fact, he did not have his own way in everything. This is especially true with reference to Miss McClellan. He was not on speaking terms with her. He thought, after the doctor's death, that she ought to be discharged. Mr. Taber, a witness for defendants, had a talk with him upon this subject, in which he gives Stephen's ideas in the following answer:

"After the doctor died, he told me, one day, that if Mrs. Garcelon had allowed him to take charge of Miss McClellan, he would have her out of the house in less than 24 hours."

But Mrs. Garcelon said she should have a home as long as she lived, and she kept her promise. Again, Stephen disliked the coachman. He did not want Mrs. Garcelon to keep him. But Mrs. Garcelon did keep him. She had her way. The day after she was buried the coachman was discharged. Frank Purinton was asked as to which one, Stephen or Mrs. Garcelon, dominated the other:

"Q. When you did see any opposition between them, what would be the outcome of the matter? Which would give way? A. He would give way."

And then he stated an instance, about the repairing of a house for one of the tenants, when Stephen gave way, and as another evidence of the correctness of his previous testimony, he said that Stephen told him that "he hated the boys [nephews], and, if he could have had his way, they should never have had a dollar of the doctor's money. He advised Mrs. Garcelon to fight it." But

Mrs. Garcelon felt friendly to the boys, notwithstanding their threats to contest the doctor's will, and she favored the compromise, and carried it out.

It is unnecessary to further refer to this kind of testimony. Mention has only been made to that offered by the defendants. Other matters appear in other portions of this opinion. The entire testimony shows clearly that there was no fraud or any undue influence upon the part of Stephen W. Purington. He was absolutely unselfish. He never used or tried to use his position, or any influence which he may have had, for the purpose of securing any favor or advantage for himself. The charge against him is absolutely unfounded.

The main reliance of the defendants to establish fraud and undue influence consists of an attack upon the acts and conduct of Judge Stanly in connection with the entire transactions involved in this litigation. It is earnestly contended that his was the dominant mind that controlled, directed, and governed Mrs. Garcelon in the execution of the instruments; that it was his wishes, not hers, that found expression in all the documents; that she was but as a child compared with his great strength of mind, and gave way to his desires and his interests, and was solely under his influence; that he was "a man of remarkably strong force, of determined, masterful personality, a man of power, a leader, one who dominates wherever he is, one whose every act before this court and concerning this trust was the dominating spirit." In the light of the many charges against him, it will be well to first inquire and find out what his conduct was. How did it happen that he was called upon to draw up the documents? What did he do? How did he do it? Why did he consent to act as trustee? What were his motives? What advice did he give? What salary did he receive? Did the idea of conveying the property which Mrs. Garcelon possessed to the college or to the hospital originate with him? Did he at any time exercise any undue influence, or any influence, over Mrs. Garcelon, which induced her to convey any of the property to charitable uses or purposes?

As every act performed by him has been seriously questioned and his motives impugned, it is but a simple matter of justice that a synopsis of his testimony, which was taken by deposition at the instigation and on behalf of the defendants, and which they now seek in a measure to deny and overthrow, should be considered at the outset. But, first, as to the character of Judge Stanly, as shown by the testimony. John A. Stanly is a native of North Carolina. He had been engaged for nearly a quarter of a century in the active practice of the law in the state of California. He was the senior member of the law firm of Stanly, Stoney & Hayes, each of whom stood well and high in the profession. The firm had a large and valuable clientage. Judge Stanly is a man of wide and extended experience. His legal ability and sound judgment are unquestioned. He is a man of strong and fixed opinions, settled convictions, and great strength of mind and will power. He was a near neighbor and close friend of Dr. Mer-

v.75f.no.6—32

ritt during his lifetime, a visitor at his house, and upon friendly relations with him; and after his death he maintained the same kind and friendly relations with Mrs. Garcelon, as her neighbor and friend. Dr. Merritt died in August, 1890, leaving as his heirs at law his sister, Mrs. Garcelon, the widow of the late Dr. Seward Garcelon, and two nephews, James P. and Frederick A. Merritt. After making a number of bequests, the twenty-second clause of his will reads as follows:

"I give and bequeath all the rest, residue, and remainder of my estate, real and personal and mixed, of every name and nature, to my sister, Mrs. C. M. Garcelon, * * * one-half of the income of which * * * to be devoted to such charitable uses and purposes as she may elect for the period of ten years."

The twenty-third clause reads as follows:

"I will, devise, and direct that if any legatee or devisee named in this will should in any way contest this, my last will and testament, or prevent and hinder its execution, they shall forfeit all claim upon my estate under this will, and in that event I hereby revoke any bequest or devise made to said legatee or devisee."

By the terms of this will he gave Frederick A. Merritt a note of $4,000 and an annuity of $300 a year for 10 years, and to James P. Merritt an annuity of $500 per year for 10 years. Being dissatisfied with these provisions, they threatened a contest. It is with reference to this matter that Judge Stanly first appears. Upon request he called upon Mrs. Garcelon in the month of November, 1890. Judge Hamilton, who was then the attorney for Mrs. Garcelon, and Judge Lawton, who was one of the executors of Dr. Merritt's will, were present. The substance of the conversation that then took place is given by Judge Stanly as follows:

"I repeated to Mrs. Garcelon that I had come, not as an attorney, but simply as her neighbor and her friend, to give her any advice that I was capable of giving. And she told me that what she wanted to consult me about was the advisability of compromising this threatened contest upon the part of the nephews. * * * I asked her what her disposition about the matter was, and she said that there were no grounds for the contest; * * * that they were threatening her with suit; * * * that Judge Hamilton and Mr. Lawton had both advised her not to compromise with them,—not to give them anything. They both spoke up and confirmed that, and said there was nothing to be compromised, nothing to settle, and no grounds for contesting the doctor's will. I told her that I agreed with her and them as to the want of grounds to contest, but that still my judgment was that she ought to compromise and settle with them; that my judgment was based upon the fact that she was a very old lady, * * * that if she went into a contest it would probably last as long as she lived, and she would have no opportunity of carrying out the bequests. * * * She said: 'Well, I agree with you, but if I give them anything, they know nothing about the value of money, and they will squander it, and they will be robbed of it before it has time to do them any good whatever.' I said: 'Mrs. Garcelon, it is your property, and, if you give them anything, you can give it upon such conditions as you please. You can put what you give in trust, so that they can only get the income of it, and you can thereby secure to them a comfortable living, or an ample income, as long as they may live.' She said: 'Well, if I can do that, I will do it. I will give them something.' When she wanted to know how much I thought she ought to give them, I told her that their claim was for one-half of the estate; that of course a compromise meant a concession from that claim. * * * There was a good deal of talk to the same effect, Judge

Hamilton and Mr. Lawton maintaining their position that it was a fruitless contest, admitting the force of my views as to the inconvenience of it, and the possible result, the old lady's death, etc., and she came to the conclusion that she would compromise and settle. At that point I got up, extended my hand to her, * * * and said, 'Good evening, Mrs. Garcelon, and I am very glad that you have come to this conclusion.' And I started to the door. * * * Judge Hamilton spoke up, and said: 'Judge, one minute. You are an intimate friend of W. W. Foote, and if there is going to be any negotiating done here, you can do it very much better than I can, and I wish you would undertake it, and do it.' I said: 'No, I don't want to make any negotiations. I have come here and given Mrs. Garcelon the best advice I knew how to, and I suppose that is all Mrs. Garcelon wants of me.' Judge Lawton joined him in the request that I would open the negotiation with Mr. Foote. Mrs. Garcelon entreated me to do it, and very reluctantly I consented. At the end of the conversation I got up and started to leave, and Mrs. Garcelon came out of the billiard room with me. * * * She said: 'Judge, these boys are contesting my brother's will. I do not want them to contest mine; and I want you to fix it, if possible, so that they cannot contest my will after I am dead.' I said: 'Mrs. Garcelon, I will try it and see what can be done.' * * * I forgot to mention another matter that occurred in the interview with Mrs. Garcelon. After I had consented to act as negotiator for them, the question arose as to how much should be offered them. It was suggested by one of the gentlemen present that they should be offered twenty thousand or twenty-five thousand dollars; that their claims could be bought for that easily enough, and he thought he could do it. I told him: 'Very well, then; you had better go and do it. But if I am going to negotiate the matter, it has got to be upon a basis of giving them something which will be substantial, and commensurate with their claim,—something that is commensurate with their position as nephews of Dr. Merritt; and if any petty little sum is to be offered to them you can do it yourself.' And it was at last agreed that I should offer them two hundred and fifty thousand dollars in money and property."

This testimony is uncontradicted. Judge Lawton was called as a witness by the defendants, and testified upon other points, but there was no denial as to this conversation. Judge Hamilton was in court during the trial, but was not called as a witness by either side.

A meeting was had between Mr. Foote, representing the nephews, and Judge Stanly. With reference to their first meeting, Judge Stanly said:

"I told Mr. Foote: 'I am authorized to open a negotiation with you to settle the claims of these nephews of Dr. Merritt to their interests in his estate, upon two conditions, which must be accepted as the basis of all of my negotiations, for my authority is limited by them: First, that any property or money which Mrs. Garcelon gives * * * shall be conveyed in trust, so that they can only spend the income of it; and, second, that provision shall be made by them which will secure Mrs. Garcelon or her estate from any attack or contest upon their part of any disposition which she may hereafter make of any of the rest of this property derived from Dr. Merritt's estate.' He accepted them promptly."

The negotiations were carried on at several meetings. Mr. Foote declined to accept the $250,000, and Mrs. Garcelon authorized Stanly to offer $500,000, which he did. This proposition was accepted, and on November 15, 1890, the Knowles trust deed was executed, and the compromise papers signed. The record shows that both of the nephews fully understood all of the conditions embraced in the compromise papers, and so did Mrs. Garcelon, and all of them at that time were fully satisfied. W. W. Foote corroborates the testimony of Judge Stanly with reference to this compromise.

After this settlement was made, at a meeting between himself and Mrs. Garcelon, the following conversation occurred:

"She said: 'Now, I suppose I can do what I please with the rest of my property.' I told her: 'Yes, Mrs. Garcelon; but better not be in any hurry. You had better wait and take plenty of time to consider. You are in no trouble now, and it must give you a good deal of trouble to know how to dispose of this estate.' She said: 'No; I have made up my mind what I want to do with it. I want to give some few legacies [as she called them] to some of my friends and relatives down East. * * * I want to give my real estate here to establishing and maintaining the hospital which you and Samuel talked about in my presence three or four months before he died, so that they can spend the income of it for the support of that hospital. The personal property I want to give to the Bowdoin College,—all after what I give in the few legacies.' She asked me if I would not write her will. I told her: 'No, Mrs. Garcelon, you must get Judge Hamilton to do that; and if Judge Hamilton needs any help from me, if I can be of any assistance to him at all, I will gladly render it. But you had better take some time to consider about this thing, and know just what you are going to do before you start. You are in no hurry about it.'"

With reference to the conversation with Dr. Merritt, alluded to by Mrs. Garcelon, Judge Stanly first gives a prior conversation with Dr. Merritt, when the doctor said:

"'I want to talk with you about a hospital which I propose to build and endow, if I can, and I want you to help me to formulate it.' I asked him, 'How can I help you, doctor?' He said, 'I do not want to give my money for the benefit of paupers. All of my property is taxed for their support now, and will be, into whosoever hands it goes. I want to establish a hospital that will be a scientific institution, where the recipients of its benefits will be people who need the services of such an institution, but who are not paupers.' I told him I thought we could fix that, and I asked him, 'What amount of money do you want to give for this?' He said, 'I want some of your experience. You were a director, for a great many years, out here at the deaf, dumb, and blind institution. How much did it take there to take care of those people,—how much per capita?' I told him, according to my memory, which I now forget, and he said, 'Now, I want to give a few very small amounts of money to several of my relatives and friends, but I want to provide an ample income for my sister, as long as she lives, and I want to devote the rest of my fortune to that.'"

About a week after this conversation one of the members of the Merritt household told Judge Stanly that Dr. Merritt wished to see him, and the conversation that Mrs. Garcelon referred to as having occurred between the judge and Dr. Merritt is given as follows by Judge Stanly:

"I went up and found the doctor and Mrs. Garcelon in the billiard room, and he asked me, 'Well, what have you thought about this?' I told him that he could provide for the recipients of the benefits of this charity, so as to exclude paupers, without any difficulty, but that the chief difficulty lay in the fact that he wanted to do it by will, and that he could not dispose of that much of his estate for charitable purposes by will. He said that his sister was the only person interested, and that she would not object to it. And she * * * said: 'No, I will gladly join you, Samuel, in anything of the kind that you want.' But I suggested that somebody else might object, and I said, 'These nephews of yours, they can object to your doing it by will.' He got a little excited, used some pretty rough language, and we talked there half an hour back and forth about this hospital scheme, and I told him that he could do it, but that he would have to do it by deed,—that he would have to convey his property. I told him he could convey it so that he could retain the income of it for his own uses, if he wanted to; and his reply to me was, 'I will be ——— if I pull off my boots before I go to bed.'"

After the compromise trust deed had been executed and delivered to Capt. Knowles, Judge Stanly testified that Mrs. Garcelon then said:

" 'Well, now I can go and do what I want to do with the rest of my property, can I?' I told her, 'Yes, madam.' She asked, 'What is this that you have been telling Judge Hamilton, that I ought to do this by deed instead of by will? He has told me that you had advised that I make my disposition of it by deed instead of by will. What does it mean?' I tried to explain to her as well as I could the advantages of making it by deed instead of by will; * * * that she could dispose of her entire property for charitable purposes by deed, and could only dispose of one-third of it to charitable purposes by will. I explained that to her as fully as I knew how, until she got to understand it. She then said, 'Well, when can you write that deed for me?' I said, 'Well, Mrs. Garcelon, you must call on Judge Hamilton to write that deed, and not me. Judge Hamilton is your lawyer, and you tell him what you want to do with your property, and if he needs any assistance or any help in this matter, let him come to me, and it will give me great pleasure to help him; but it is not right or proper that you should go behind him, and get me to draw this deed.' She replied, 'I want to have nothing to do with Judge Hamilton. He and Stephen have fallen out,—they do not agree,—and what I am going to do with it I want to keep secret.' * * * I told her * * * that Judge Hamilton and all lawyers knew the value of a client's confidence; that she could not find a lawyer who, if she said that she wanted this kept secret, would expose it. * * * I discussed it with her for half an hour or more. * * * I advised her to send for Judge Hamilton and talk with him about it."

All of the conversations with Judge Stanly, with a few exceptions, when Stephen Purington was brought in, were studiously, purposely, and intentionally on her part confined to Judge Stanly and herself. She wanted and insisted that the whole matter should be kept secret, and was desirous of even keeping the matter from Stephen. On the 22d day of February, 1891, Mrs. Garcelon called Judge Stanly in, and expressed her desire to fix the matter up, and he again earnestly urged upon her to restore friendly relations with Judge Hamilton, and get him to draw the papers. Failing to get her consent to do this, Judge Stanly told her that he would try and do what she wanted. She repeated her desire to give her real estate to the establishment and support of a hospital, and her personal property to Bowdoin College. Judge Stanly explained to her that the laws of the state in regard to trusts provided for trusts of real estate for certain special and specified purposes only; that she would have to give the property to be sold and the proceeds to be paid to the trustees. He advised her that, instead of dividing the property as she proposed, it would be better to divide it in some other way; that it would be better to give to Bowdoin College the same proportion of the value of the estate that the personal property bears to the whole. This was agreed to, and Stephen was called in, and he figured it out that there was six-tenths real property and four-tenths personal property, and it was from his estimate that the division between these institutions was made. The conversation with reference to this subject lasted all day. Mrs. Garcelon, in reply to the question as to what individuals she wished to give money to, handed over a list of names and the amounts to each, and it footed up less than $60,000. The estimated value of the property was $1,250,000.

$400,000 was to be given to the college, and $600,000 to the hospital, and $250,000 to her relatives and friends. Judge Stanly advised her to call in Stephen and revise the list. Stephen mentioned several relatives not on the list, and she was requested to ascertain the names of others, because nothing could be done until the full list was furnished. Additions were made from time to time during the week, but the amount fell short of the sum that she had agreed upon. Suggestions were made to increase the amounts. When some small amounts were mentioned she said "that she and her husband lived for thirty odd years in Maine, that they had lived respectably, kept house, and entertained company as well as any of their neighbors, and no single year had they ever spent $500 a year." Nevertheless, she commenced increasing the individual amounts, and got it up to about $100,000. Interviews were had every evening. Some of these interviews show clearly the strength of Mrs. Garcelon's mind, and exhibit her strong will power and independence. At one time Judge Stanly said:

" 'Now, Mrs. Garcelon, are you sure that you have not forgotten somebody?' She said in reply, 'Well, you evidently think that I have forgotten somebody. You are referring to Miss McClellan, are you not?' I told her, 'Yes, that was just exactly what I had in my mind.' She said, 'It is intentional. I have not omitted it. She has got enough from my brother's estate. Don't you think so? I told her, 'No, I did not think so,' and went on and told her the reason why I did not think so."

These reasons are given at length in the testimony. It was an impassioned, earnest appeal, backed up by a strong argument for justice to be meted out. The reasons, at first blush, would seem eminently sound and unanswerable. But Mrs. Garcelon immediately, and with equal earnestness, combatted the argument of counsel, and insisted that her brother had done "everything that was just and right." She detailed the facts in a very strong manner, and declined to change her mind. Other appeals for an increase were in two cases more successful. Stephen W. Purington urged that she should raise the sum of $2,000 given Harry P. Merritt. She first raised it to $5,000, but upon further appeal by Stephen she raised it to $10,000, and then said, "Make Frank Purinton's $10,000 instead of $2,000." This was the only time Stephen W. Purington made any suggestions. Judge Stanly, when the name of Miss Minnie Dyer was called, to whom she had given $2,000, spoke highly of her character, and Mrs. Garcelon said: "Give her $5,000. * * * I cannot give her $5,000, without giving Mrs. Gordon $5,000; so make both of them $5,000."

The list was finally completed in the early part of March, and a typewritten draft of the deed of conveyance and declaration of trust was then given to Mrs. Garcelon. The bill of sale was not then drawn up. Mrs. Garcelon from the first insisted that Stephen W. Purington should be one of the trustees. She wanted Judge Stanly to act as the other. He repeatedly declined, and at one interview with her stated that he would not act for $50,000,— that he could not afford to accept the position. He named five or six representative men that he thought would be satisfactory

trustees, and left their names with Mrs. Garcelon, so that she could take her choice. Finally, on the 20th of April, 1891, Stephen came as a messenger for Mrs. Garcelon, and after stating to Judge Stanly that she thought $50,000 was too much to pay to any one to become a trustee, that she would not listen to anybody else being appointed, and that he was authorized to offer him $25,000, Judge Stanly testified:

"I told him I could not do it; that it was altogether too little; that it would cost too much of a sacrifice upon my part. And during the talk he said: 'Well, if you will take the $25,000, you may have all the commissions,— all of the compensation that the trustees get for administering this trust,— with the exception of $125 a month to me, the same compensation that I have been getting from Mrs. Garcelon, and from Dr. Merritt for two or three years.' I told him I did not want any of his compensation, and did not want to take it away from him. He said, 'I am willing to do that.' After considerable talk about it, I told him, 'All right, if Mrs. Garcelon will have it so, I will accept it; but it must be with the distinct understanding that I am going to give no attention whatever to the details of this business. It is entirely foreign to me. I am willing to act as your adviser in the matter, to come and relieve you of responsibility as to what to do and how to do it; but as for making collections and keeping money and * * * accounts, I will have nothing to do with it.' "

The documents were executed by Mrs. Garcelon, and delivered to the trustees April 21, 1891. It is true, as before stated, that Mrs. Garcelon did not name all of her relatives. Can it be said that this furnishes any ground for setting aside the transaction on the ground of undue influence? Certainly not. The truth is that no dominating mind of any person caused her to overlook any of her relatives or friends.

It appears from the testimony that Mrs. Garcelon, at various times, executed three different wills. One drawn up by Judge Hamilton, and signed by her in September, 1890; one drawn by Judge Stanly, August 12, 1891; and another, November 18, 1891. This last will was afterwards probated. It was the same as the second, except it substituted the name of Harry P. Merritt for Frank Purinton. Much stress is placed upon the fact that the will which was drawn by Hamilton did not make any mention of any college or hospital. It having been drawn so soon after Dr. Merritt's death, it is claimed that, if he had made any request or expressed any desire to have his property given to the hospital or college, it would have found expression in that will. The will referred to was never probated. It bequeathed all the property to Stephen W. Purinton. The second clause therein reads as follows:

"It is my will that, so far as he may be able, he will carry out the provisions of the will of my deceased brother, Dr. Samuel Merritt, and as to the rest and residue of my said property and estate he will make such disposition thereof among my kindred and other persons as he may choose, leaving him free to make such disposition thereof as he may deem proper, relying, as I do implicitly, upon his good judgment and kind disposition to make a proper and equitable disposition of said property, better than I could myself make, perhaps."

And it is argued that this clause negatives, rebuts, and overthrows all of the testimony of Judge Stanly and all the other wit-

nesses concerning the subject of the hospital. It may, at first blush, seem strange that nothing about this hospital fund was mentioned in her will; but it must be remembered that Dr. Merritt left all the property to Mrs. Garcelon, knowing, as he evidently did, that she would endeavor to carry out his wishes. It has already been shown that Mrs. Garcelon knew Stephen W. Purington, and confided in and trusted him. She knew that he had no selfish designs upon the property of the estate, and hence, entertaining such confidence, she simply said: "It is my will that * * * he will carry out the provisions of the will of my deceased brother."

But, in whatever light the language of this will may be viewed, it does not rebut or destroy the fact, testified to by several witnesses, that Dr. Merritt had frequently expressed favorable views with reference to the building and endowment of a hospital, and that Mrs. Garcelon well understood his wishes in regard thereto, and expressed her intention to carry them out. The testimony of Judge Stanly as to Dr. Merritt's intention to found or endow a hospital is corroborated, inferentially at least, by the testimony of Dr. Southard, Dr. Buteau, Capt. Knowles, Mr. Bartlett, Capt. Simpson, J. F. Noyes, and Rev. Dr. McLean, each of whom testified that, in conversations had with Dr. Merritt, he frequently discussed this subject, and expressed his intention to endow or assist in founding a hospital. Mr. Bartlett testifies that, one evening, about a year and a half before Dr. Merritt died, he was present at his house, in company with Mrs. Garcelon, Miss McClellan, Capt. Knowles, and other neighbors whose names he could not recall; that the conversation led up to a hospital. He adds:

"I took occasion then to ask him, to urge upon him, what I thought in part a duty,—at any rate, a privilege,—to build and endow a hospital for Oakland. * * * I said to him that, as he was an educated physician, and had abundant means, * * * that he was getting along in years, * * * it would be a good thing for the public if he would build and endow a hospital, and that he was a man of a great deal of constructive ability as well as a good knowledge of medicine, and he knew exactly what was wanted, that he would have a great pleasure in building it, and that it would be his monument. * * * He, to my surprise, instead of kicking, as he sometimes did when propositions might be made to him, took it into serious consideration. * * * He talked so clearly and so friendly with respect to the proposition that I was clearly impressed he would build it in his lifetime, and said so to persons who were present. * * * Q. Did Mrs. Garcelon take part in the conversation on that occasion? A. She was at the time conversing partly * * * with Capt. Knowles and partly with some ladies * * * at the other end of the room. * * * The conversation of Mrs. Garcelon ceased immediately when I began to talk to Dr. Merritt. * * * I noticed that she seemed to nod an assent, but at some one point of the conversation, after, I think, I proposed that he ought to build it, * * * she made a remark something like this: 'Yes, Samuel, you ought to do it.' That was all I heard from her at that time."

Capt. Knowles, referring to this conversation, said: "Mr. Bartlett's story here yesterday was about as straight as I could get it."

Rev. Dr. McLean had several conversations with Dr. Merritt on this subject. He urged substantially the same reasons as Mr. Bartlett. At one time Dr. Merritt gave an expression in regard

to this subject, which tends to explain why he did not act in this matter during his lifetime.    Dr. McLean testifies:

"I remember on one occasion he said to me, 'That is all very nice; but I tell you what it is, McLean, it is an awful hard thing for a man who has been seeing money come in all his life to let a big chunk of it go.' I said, 'Yes, but if he gets a big chunk of satisfaction, it is a case of bargain and sale, is it not?' I said I hardly knew how he could have more satisfaction than by doing something of that kind. He said, 'That is so; it is a good scheme.'"

Dr. Buteau testifies that Dr. Merritt drove out with Mrs. Garcelon to look at the hospital grounds, and the subject was discussed in a long conversation, and that, as Dr. Merritt started to leave, he said, "Well, doctor, *  *  * when I am dead and gone, you will live to enjoy the benefits of my hospital." Dr. Southard testifies that after Dr. Merritt's death Mrs. Garcelon conversed with him upon this subject. "She said that it had been one of the desires of the doctor to have the finest hospital in the state, or on the coast, in Oakland, and that she hoped she would live long enough to see it built." The testimony of the other witnesses were equally strong.

But a complete answer to this whole matter is found in the fact that Judge Stanly never attempted to influence Mrs. Garcelon about the hospital scheme. It was her own idea, her own wish, her own mind, that controlled this matter, and she had the right to do as she pleased in the premises, and she did.

So with reference to Bowdoin College. Judge Stanly had no motive in favoring that institution. The idea of any gift to Bowdoin College did not come from him. The name given to this fund is indicative as pointing out the person who originated it,—the "Seward Garcelon and Samuel Merritt Fund,"—Mrs. Garcelon's husband first, and her brother next. Mrs. Gordon testified to a conversation which she had with Mrs. Garcelon upon this subject about the time of the execution of the trust, as follows:

"She said that Dr. Merritt had left her a certain amount of money to give in charity, and she would rather put it into one thing, and she knew it was his desire to build a hospital in East Oakland, and so she was going to carry out that idea, and build a hospital. And then she said she wanted to remember Bowdoin College, as her husband went there,—he graduated from there, and her brother too,—and that she should remember that."

Two other circumstances ought to be referred to in this connection, not only as tending to show whose mind it was that controlled the various clauses in the instruments, but to confirm the statement heretofore made that Mrs. Garcelon was not controlled by Judge Stanly with reference to these charities. When the college donation was under discussion, Judge Stanly was anxious that the University of California should get something, and he suggested that it would be a good thing to give it at least one-half of the amount that she proposed to give to Bowdoin College. Now, Mrs. Garcelon—this weak, sick, and feeble old woman, whom defendants claim had no mental capacity whatever, and who had no mind of her own, but was dominated over by Judge Stanly—spoke up at once and said: "No, when Samuel was regent there, they did not treat him well, and they shall

not have a dollar." Mrs. Garcelon had her own way. Bowdoin College got the money. Judge Stanly, in drawing the documents, carried out her wishes, not his own. With reference to the hospital, Mrs. Garcelon had requested Judge Stanly to consult with Drs. Agard and Pinkerton. They objected to a certain clause in the declaration of trust because it was broad enough to make it a lying-in hospital, and they understood that Dr. Merritt wanted it to be a scientific institution. When these objections were made known to her, she refused to make any change, and said it was drawn up just as she wanted it; that she had been a doctor's wife, and knew, from her own personal experience and knowledge of cases, that the treatment of the confinement of mothers would be the "greatest kind act of charity." Her wishes controlled.

It is argued that the trust is invalid because the relation of attorney and client existed between her and Judge Stanly, and that of principal and agent between her and Stephen W. Purington, and that she did not seek or obtain independent advice in regard to the execution of the trust. Why did not Mrs. Garcelon obtain independent advice? Whose fault was it that she did not? She had the opportunity to do so. Judge Stanly insisted upon her going to her attorney and talking the matter over with him. But here, again, his strong will power had to give way to her wishes. She wanted it kept secret. But it leaked out. Capt. Frank Purinton and his wife knew it, and they were members of the household when the transaction was going on. Mr. and Mrs. Taber, her friends and neighbors, knew it, and talked with her about the worry and trouble it was giving her. Several others knew it. Mrs. Garcelon had ample opportunity to seek independent advice. She was not prevented from so doing by Judge Stanly or by Stephen W. Purington.

The principle as to the necessity of seeking independent advice arises only in cases where the trustees or agents are seeking by the trust deed to obtain some advantage for themselves. Such is the case of Ross v. Conway, 92 Cal. 632, 28 Pac. 785. There the defendant Conway was the pastor of the Roman Catholic Church of which Mrs. Ross was a member, and her spiritual adviser. The court found "that a confidence was reposed in him by her, and that there existed on his part an influence and apparent authority over her, arising out of his relation to her as spiritual adviser, and that he took an unfair advantage of this influence, and used this confidence and authority for the purpose of procuring her to execute the two deeds of trust" of her property for the benefit of himself and of the church of which he was the pastor. It was in relation to such facts that the court correctly stated that.

"The rule is inflexible that no one who holds a confidential relation towards another shall take advantage of that relation in favor of himself, or deal with the other upon terms of his own making; that in every such transaction between persons standing in that relation the law will presume that he who held an influence over the other exercised it unduly to his advantage;" and that transactions of this character will not be upheld unless it be shown that the grantor had independent advice, and that his act "was not only the result of his own volition, but that he both understood the act he was doing, and comprehended its results and effect."

The facts in some of the cases cited by defendants, notably in Caspari v. German Church, 12 Mo. App. 293, and Ford v. Hennessy, 70 Mo. 580, were substantially the same as in Ross v. Conway. Some of them were cases where the will was executed in extremis. They all proceed, substantially, on the ground, as stated by Lord Chancellor Sugden, in Thompson v. Heffernan, 4 Dru. & War. 291, that:

"A deathbed is not the fit place nor the proper time at which a clergyman of any denomination should look to his own personal interest or seek to obtain the property of a dying man. On such an occasion, if a man has a testamentary intention, and time allows, proper advice should be obtained. * * * Advantage should never be taken of a man's last moments in order to obtain disposition of his property in favor of persons not connected with him by blood."

In all transactions of this character, when the spiritual adviser receives any advantage, courts of equity decline, as a general rule, to enter into any investigation as to the extent to which his influence was exercised. As was said by the court in Ross v. Conway:

"Any dealing between them under such circumstances will be set aside as contrary to all principles of equity, whether the benefit accrue to the adviser, or to some other recipient, who, through such influence, may have been made the beneficiary of the transaction."

Where the confidential relation of attorney and client or of principal and agent exists, and the attorney or agent is a large beneficiary under the trust, it devolves upon him to show that the grantor or testator was of sound mind, that he clearly understood the contents of the deed or will, that he was not under any restraint nor undue influence, and that the gift was freely and voluntarily made; but, if such facts are proven, the deed or will and the gift will be declared valid and be sustained. Ralston v. Turpin, 129 U. S. 663, 675, 9 Sup. Ct. 420; Wilson v. Mitchell, 101 Pa. St. 496; Eastis v. Montgomery, 95 Ala. 486, 493, 11 South. 204; Soberanes v. Soberanes, 97 Cal. 141, 31 Pac. 910; 1 Devl. Deeds, § 84; 1 Jarm. Wills (8th Ed.) 36, note.

In Mackall v. Mackall, 135 U. S. 167, 172, 10 Sup. Ct. 705, the court said:

"Confidential relations existing between the testator and beneficiary do not alone furnish any presumption of undue influence."

In Eastis v. Montgomery, supra, the court said:

"There is no evidence in the record of any activity on the part of Jonathan Montgomery in and about the preparation and execution of the will, except such as was the result of the wishes and requests of the testatrix, which, so far as the evidence discloses, were entertained and expressed by her of her own free will, and not themselves induced by any undue influence. Such activity, not of proponent's own motion, or prompted by personal motives, but in behalf of the testatrix, and in furtherance of her purposes, will not combine with confidential relations to shift the burden of proof as to undue influence upon the proponent."

In McCulloch v. Campbell, 49 Ark. 371, 5 S. W. 590, the court said:

"The will was indeed made upon the suggestion of McCulloch. But he was the trusted agent and business manager of Mrs. McClure, and was therefore entitled to give advice on such a subject. The will, moreover, contains no provision in his favor, although he is named as executor; and there is

no reason to believe that he sought to influence her for or against any of her relations."

In the present case Judge Stanly never sought to obtain any advantage for himself, nor for the hospital, nor for Bowdoin College. He never sought to influence her for or against any of her relatives. He is not a beneficiary under the trust, and there is no room or ground for the application of the principles announced in Ross v. Conway and other cases of that character. There was no absolute necessity for Mrs. Garcelon to seek for any independent advice. It is enough that she had the opportunity of doing so, that she was not prevented from doing so, and that she fully comprehended and understood what she was doing, and that her disposition of the property was her own voluntary act.

But it is said that Stanly had a motive of pecuniary gain in obtaining from Mrs. Garcelon the position of trustee,—that, to quote the language of one of the counsel for defendants, "by means of this alleged trust he secretly extorted from Mrs. Garcelon, without consideration, the sum of $25,000, to begin with." If by this it is meant that the sum of $25,000 was too big a fee, the answer is, who, with any appreciation of the time and labor that would be involved, the complaints, vilification, and abuse that he was liable to be subjected to, in having his character as a man and standing as an attorney assailed, would have been willing to have accepted the position for a less fee, if he had the executive ability, capacity, and legal knowledge necessary to faithfully and conscientiously discharge its duties? The fee, large as it is, was not near as much as Mr. Foote received for his services in securing the compromise for the nephews. Fees of this character are usually large, and, when agreed upon in advance, are generally fixed so as to be commensurate to the service and time required, if the matter in issue should be contested to the end. To illustrate: If Mr. Foote could have foreseen how easily he could procure a compromise, he might have been willing to accept a less fee; and if Judge Stanly could have imagined the difficulties, troubles, and annoyances, and attacks upon his character, he might have demanded a higher fee. But, in any event, in all such cases it might be said that any attorney, accepting such a trust, would have a motive of pecuniary gain.

It is, however, charged that Judge Stanly secretly extorted the fee from Mrs. Garcelon, and this charge is sought to be sustained, in part, at least, by the testimony of Capt. Frank Purinton, as to what Stephen W. Purington said about the matter. Whenever a question of extravagance in money matters is involved, crusty, close, and economical Stephen is referred to, and his opinions and declarations on the subject are brought to the front. During the time of the negotiations with Judge Stanly, Stephen met Frank and told him that he had not slept a wink all night; that they had to pay Stanly $25,000. Frank testifies that on this occasion Stephen said to him:

"You are not to be in the trust. He is to be there. He says, 'He has worked the old woman till he has got the job.' * * * Q. Did he give any

reason why he had not slept all night about it? A. On account of Judge Stanly robbing her. Q. What? A. On account of Judge Stanly robbing her,—robbing the old woman,—Mrs. Garcelon. Q. What did he say about it? A. That is what he said,—'robbed her of $25,000.'"

Contrast this declaration with Stephen's generous offer, when Judge Stanly said $25,000 was not enough, to give him all of his own compensation, except a salary of $125 per month. Stephen recognized the value of Judge Stanly's services, and he wanted him to accept the trusteeship. He knew that he could get along with Judge Stanly, and Mrs. Garcelon wanted a trustee that would be agreeable to Stephen. The facts are that Judge Stanly did not seek the position. He at first declined it. He insisted, and tried to persuade and induce Mrs. Garcelon to get her regular attorney to prepare the necessary documents, and he recommended to her the names of several prominent business men of high standing and good character from which she could make her own selection of a trustee.

It is asked, why did not Mrs. Garcelon appoint Capt. Frank Purinton as trustee in place of Judge Stanly? She had sent for him and his wife to come and live with her, to be her companions in her old age, and was paying them $200 per month as a salary to remain with her. There is testimony to the effect that one object she had in view in bringing Frank from Maine was to have him instructed so that he could take Stephen's place if anything should happen to him. There is no doubt that she thought of making Frank a trustee at the inception of the transactions relative to the compromise. What was it that changed her mind? This question is answered by a reference to the testimony. Her reasons for leaving him out of the trust deed to the nephews were sound and substantial, and furnish another instance of the strength of her mind, of her independence of character, and the firmness of her resolution when settled and fixed. Frank Purinton had been the master of, and was part owner in, a vessel then at sea. He had for years been engaged in that business, and was adapted to it. He had a mind of his own, and was not afraid to express it, whether it suited other people's views or not. He often came in conflict with the ideas and views of Mrs. Garcelon, and was disposed to follow his own judgment, instead of hers, about many matters. Among other things, she had frequently expressed her anxiety about both of her nephews. James had a habit, as she thought, of drinking too much, and she wanted to reform him. In the language of one of the witnesses, "she was animated by an active, honest, natural desire to try to restore him to a respectable position in society." This was to her credit. With a knowledge of this condition of her wishes, Capt. Frank invited James to take a drink in a saloon. This came to her knowledge in the following manner: W. W. Foote testified that, in a conversation with Mrs. Garcelon with reference to agreeing upon a trustee of the property given to the nephews, "she insisted on having Capt. Purinton as trustee. I did not want him. I knew nothing about him, and the boys told me they did not want him. She kept insisting on having him,

and she wanted to know why I didn't want him. I told her, because I had.been in a saloon in Oakland a while before that, and I knew what her ideas about that were as to the boys, and that * * * I had seen Capt. Purinton * * * in there taking a drink at the bar with Jim. * * * She wanted to know if I was sure. I told her I was." Not being very well acquainted with Mr. Foote, she made further inquiries about this matter. She asked Judge Stanly if he would believe and rely upon what Mr. Foote would say. Judge Stanly testifies:

"I told her, 'Mrs. Garcelon, if Mr. Foote was to tell me that he had seen or heard anything himself, I should believe it as implicitly as if I had heard or seen it myself.' * * * She said, 'Then Franklin cannot be one of my trustees. If he has so little regard for what he knows to be my wishes, and my anxiety about James, and about reforming his habit of drinking, as to go to saloons and drink with him, he cannot act as my trustee.'"

That is why she changed her mind. But that was not the only reason she had for not appointing him a trustee with Stephen in the other deed of trust. At the time the matter of the disposition of her property was under consideration the captain, as before stated, heard of it, and made a request upon Mrs. Garcelon. His ship was coming from the East, and he insisted upon having a sum of money outright as a compensation for giving up his position as master of the vessel. There is a conflict as to the amount he demanded, one witness placing it at $50,000. Capt. Frank denies that, but admits the demand for money. When this request was made of Mrs. Garcelon, she advised Frank to go to sea, as he understood that business, and promised to pay his wife the salary of $200 per month for her to remain and be her companion. The captain refused to go to sea without his wife, and he said it would be a long time before he would be able to get anything she might give him in the papers, and that he wanted to have the matter arranged without delay. The result was that he got a bonus of nearly $10,000 in notes and securities, but he did not get the position of trustee in the trust papers.

It is contended that Mrs. Garcelon was forced and coerced into signing whatever document Judge Stanly presented to her, and numerous little incidents are referred to and relied upon to support this contention. Mrs. Shattuck tells of being present at one time when Judge Stanly came in and said to Mrs. Garcelon, "I want you to sign this paper." That Mrs. Garcelon said, "I don't want to sign it." That Stanly said, "You must sign it, and I am in a great hurry." That they walked into another room, and when Mrs. Garcelon returned she said "she had so much to do, so many papers to sign, and so much worry that she was really gone." * * * "I said, 'Why do you do it?' She said, 'I just simply have to,' and she dropped asleep." Several other witnesses testified that, after the visits of Judge Stanly and Stephen W. Purington concerning business matters, Mrs. Garcelon would be very much prostrated; that upon such occasions she would declare that she was worried and tired, and that she would be thankful when.the business was settled. The evidence given shows

that she was worried and tired, prostrated at times, and had to lie down and take a rest. But it does not show that in any of the interviews she was forced or coerced into signing the trust deed or any other paper.

The execution of the deeds must have been secured by honest means, but argument and influence may fairly be used. So may acts of kindness, attention, and affection. Mere advice, persuasion, or entreaty do not constitute undue influence. Certainly not, where there is no fraud, no deceit, no fiduciary relation existing, no force or coercion, no imposition, no duress or other improper or prohibited means. Goodwin v. Goodwin, 59 Cal. 560; Rutherford v. Morris, 77 Ill. 414; Leeper v. Taylor, 47 Ala. 222; Clifton v. Clifton, 47 N. J. Eq. 227, 244. 21 Atl. 333; Trost v. Dingler, 118 Pa. St. 259, 269, 12 Atl. 296; Goodbar v. Lidikey, 136 Ind. 2, 35 N. E. 691; Bevelot v. Lestrade, 153 Ill. 625, 631, 38 N. E. 1056. In Bulger v. Ross, 98 Ala. 271, 12 South. 803. the court said:

> "The undue influence which will overturn or defeat a testamentary disposition of property must be of such a character as to overpower the will of the testator and substitute another will in its place. It must amount to controlling mental restraint and coercion, destroying the free agency of the testator. In fact, to constitute such undue influence, the will and wish of the testator must be subordinated and displaced by the superior, dominating will of another."

In Dickie v. Carter, 42 Ill. 379. the court said:

> "If all is fair, and the result of honest argument and persuasion, or of such influence as one may properly obtain over another, the deed must stand."

In Yoe v. McCord, 74 Ill. 33, 44, the court said:

> "It is not unlawful for a man. by honest advice or persuasion, to induce a testator to make a will, or to influence the disposition of his property by will. Such advice or persuasion will not vitiate a will made freely and from conviction, though such will might never have been made but for such advice or persuasion. This does not amount to fraud, compulsion, or other improper conduct. To avoid a will, the influence which is exercised must be undue, and this, in the legal sense, is something wrongful, a species of fraud."

In the present case there is no testimony which, in my opinion, shows any attempt upon the part of Judge Stanly at any time to overpower the will and mind of Mrs. Garcelon and to substitute his own. There was no general nor any other scheme, engineered by him or any other person, to defraud her in any way or manner. When all the facts are fully considered, and carefully and impartially weighed, they show clearly, to my mind, that her will was not subordinated nor displaced by the superior or dominating or other will of Judge Stanly. In mere matters of form, and in many of the simple details, she relied implicitly, as she had the right to do, upon him, and followed his advice and suggestions to the effect that the disposition of her property should be made by deed instead of by will, and in remodeling or changing the prior wills she had made. The will that was drawn by Judge Stanly and probated was attacked, but declared valid and sustained by the supreme court. In re Garcelon's Estate, 104 Cal. 570, 38 Pac. 414. Numerous other instances have been cited where she

adopted the ideas and suggestions of Judge Stanly. But in all substantial and material questions affecting her intentions and desires as to the disposition of her property, she relied upon her own sense of right and wrong as to what she ought to do, and had her own way. This is manifest, as has been shown in the several instances where she declined to follow the advice of Judge Stanly, and relied upon her own judgment to do what was right and proper from her standpoint. All through the short, long, and frequent interviews she had with him, she maintained an independent will and judgment of her own as to what she would do, and her wishes and desires found expression in the documents before the execution thereof. It was her own mind and her own will that controlled the disposition of her property; not that of Judge Stanly, nor of any other person. She was a free agent. She was not coerced, forced, or unduly influenced or compelled to sign the documents. She fully understood their contents, and her execution of them was her own free and voluntary act. It was her deed, her declaration of trust, her bill of sale. It is true that she was worried and troubled in body and mind during the time of their preparation; but her worry and trouble did not come entirely from the frequent visits of Judge Stanly, as several of the witnesses seemed to think. She was importuned to give, not only to all kinds of charities, but to many poor, and doubtless some deserving, persons. Letters came to her from all parts of the country, asking and imploring her to do this and to do that. She turned them over to faithful Stephen for him to read, and whenever he found an appeal for money he relieved her by throwing such letters in the wastebasket, and they came so thick and fast that his patience became exhausted, and he destroyed the letters without reading them. She was surrounded by many relatives, some of whom were constantly endeavoring to seek her good graces, and others acting contrary to her well-known and frequently expressed wishes. There were other discordant elements in her household which she had to control and manage. She was old and feeble, and suffering with bodily ills. She was pained and annoyed at the selfishness of human nature as portrayed in the character of many people whom she met. She was a conscientious, intelligent, and honest woman. In all things she meant to do right. She did her best. Who, under all the circumstances, even in perfect health, could have done better?

Complainants are entitled to a decree against all of the defendants, and to recover costs against all, except as to the defendants who, in their answers, disclaimed having any interest herein, and Frederick A. Merritt.