CLAY *v.* LAYTON.

1. GIFTS—DELIVERY—TRUSTS.
    The mere act of executing deeds and assignments of mortgages, and drawing checks upon a banker, which the maker retains in his possession in separate packages, with instructions indorsed thereon that they be delivered after his death, does not constitute a gift, for want of a delivery, nor a trust, for want of a declaration.

2. TRUSTS—DECLARATIONS—DISPOSAL OF PROPERTY.
    Statements by a person retaining possession of his property, that he has disposed of it in the way he wants it to go, do not amount to a declaration of a trust, as they are as consistent with the idea that he has made a will as that he is holding the property as a trustee.

3. SAME—RETENTION OF TITLE BY DONOR.
    One who, having so arranged his property in anticipation of death that delivery of the papers according to written instructions is all that is required to be done to distribute it, still retains possession of the papers and property, will not be held to have created a trust for the beneficiaries, where there is nothing in his acts or instructions which indicates an intention that effect shall be given to the papers before his death.

4. WILLS—EXECUTION.
    A writing directing the distribution of a person's property after his death, which is not executed in conformity to the statute, cannot be considered a will.

5. SAME—DEEDS—INTENT—PAROL EVIDENCE.
    Parol evidence is not admissible to show that a deed, unambiguous on its face, was intended to operate as a will.

6. ESTATES OF DECEDENTS—CHECKS—CLAIMS.
    A check upon a bank, delivered to the payee, but not presented to the bank until after the death of the maker, if founded upon a sufficient consideration, may be collected as a claim against the maker's estate.

Appeal from Lenawee; Chester, J.    Submitted June 2, 1903.    (Docket No. 7.)    Decided September 15, 1903.

Bill by Frank W. Clay, administrator of the estate of Abel Whitney, deceased, against Sarah Layton, Sarah A. Kline Frary, and forty-three others, to determine the proper disposition of the property of decedent. From the decree rendered, the above-named defendants appeal. Reversed.

Abel Whitney, a wealthy widower, died at Adrian October 18, 1899, leaving no descendants. His heirs consisted of Sarah Layton, a sister, of Wapakoneta, Ohio, and numerous nephews and nieces residing in Michigan and elsewhere. Soon after Abel Whitney's death, the complainant was appointed administrator of his estate, upon the petition of Josephine Harris, a niece of the deceased, and he qualified in due form.

The bill alleges that Abel Whitney said to the complainant on several occasions that he had made distribution of his property as he wanted it distributed, and that he wanted it turned over to the several parties entitled thereto, by the complainant; and that Mrs. Freitag, his housekeeper, had been instructed to hand complainant the keys to a certain cupboard, standing in his library, when he should die, and that he wished complainant to open it, where he would find a tin box locked with a padlock, the key to which was in the pocket of the vest he then wore. It alleges further that, after the death of Abel Whitney, all transpired as he had stated. Upon opening the box complainant found sundry large envelopes, which, for convenience, he marked from numbers 1 to 17, inclusive. He also found three other envelopes, directed to himself, which he has marked "A," "B," and "C."

*Memoranda* upon and contents of envelope No. 1 were as follows: Indorsed:

"Deed of the Masonic Temple property to various persons in lieu of anything in my will.
                                        "A. Whitney.
"Two-sevenths, Sarah Whitney Layton.
"One-seventh, Fanny Berdan.

" One-seventh, Dwight A. Whitney.
"Two-sevenths, children of Mrs. Stevens.
"One-seventh, Mrs. Ida Kline Frary."

Inside: Warranty deed, dated March 9, 1897, from Abel Whitney to Sarah A. Kline Frary one-seventh, Helen Stevens Rhodes one-seventh, Edgar Stevens one-seventh, Fanny W. Berdan one-seventh, Dwight A. Whitney one-seventh, and Sarah W. Layton two-sevenths of the undivided one-fourth part of the Masonic Temple in Adrian. Also the following memorandum:

" In addition to the inclosed deed, I want each one named in it to have the following sums in money, and, I have made checks for the amounts, to be delivered to them at my death:
" Sarah A. Kline Frary, $200.
" Helen Stevens Rhodes, widow, $200.
"Edgar Stevens, brother of Helen, both of Delphos, Ohio, or near there, $200.
" Fanny Whitney Berdan, of Detroit, $200.
" Dwight Whitney, her brother, of Detroit, $200.
" Sarah Whitney Layton, of Wapakoneta, Ohio, $400."

Underneath said memorandum is written in the handwriting of said Whitney:

" Mr. Clay, or whosoever has these papers, deliver them to the parties at my death, checks and also deed.
                                    "ABEL WHITNEY."

Wrapped in the *memoranda* were checks upon his banker, drawn by Abel Whitney to the respective persons named for the several sums indicated.

No. 2. A similar indorsement as to Amelia H. Miller. Contents, a deed and a check.

No. 3, appropriately indorsed, contained a deed to Frank W. Clay (complainant) and Rial Clay of real estate, in trust for certain minors named therein.

No. 4. Indorsement: " This is to be handed to the officers of the Oakwood Cemetery Association in case of my death." On the inside of said envelope was the following memorandum:

"The inclosed check for $200 is a bequest to the Oakwood Cemetery Association for the care of my lots in said cemetery, numbers 13, 14, and 15, block 2, I think.

"April 9th, 1897. '          ABEL WHITNEY."

On the inside of said envelope were found two checks on Waldby & Clay's State Bank,—one dated April 9, 1897 (the same date as the memorandum), payable to the Oakwood Cemetery Association, or order, for the sum of $200, signed by Abel Whitney; and the other check dated October 7, 1899, for the sum of $500, payable to the order of the treasurer of the Oakwood Cemetery Association, signed by Abel Whitney. Upon the margin of said check is written in the handwriting of said Whitney: "For the perpetual care of his lots, numbers 13, 14, and 15, block 2."

No. 5 contained a mortgage and an assignment thereof from Abel Whitney to two nieces, living in Kansas.

No. 6 was similar to No. 5, to Emily J. Van Buskirk, of New Jersey, a niece, as to contents. The envelope was indorsed:

"Emily Jane Van Buskirk, Passaic, New Jersey, to be sent to her in lieu of anything in my will.
"A. WHITNEY."

No. 7 was indorsed:

"Assignments to Charles Whitney, of Rome township, Lenawee county, to be delivered to him at the time of my death.
"ABEL WHITNEY."

Contents, three mortgages, duly assigned.

No. 8. Indorsed: "Josephine Whitney Harris and Augusta Whitney Teachout." Contents, two bonds executed by the city of Coldwater, Michigan, Nos. 40 and 41, for $500 each, inclosed in a wrapper, upon which is written in the handwriting of said Abel Whitney the following memorandum:

"Ithaca school bond, No. 29, to Mrs. Friday, $500, with her papers,—Schwick mortgage, etc.
"A. WHITNEY."

Also the following memorandum:

"A corresponding bond to above No. 29, No. 28, for $500, I give to Fanny Lee Berdan, daughter of my late brother William A. Whitney, under the same instructions to any one handling my matters, and have placed the said bond under an envelope covering the F. J. Kuhlman mortgage. This bond is under envelope with F. J. Kuhlman mortgage assignment. Coldwater school bond No. 40 I give and bequeath to Augusta W. Teachout, and a like bond, No. 41, I give and bequeath to Josephine W. Harris, both children of my late brother Russell Whitney, to be delivered to them immediately after my death, now in envelope with deed of part of my residence property.

" Dated January 27, 1899. Adrian, Michigan.
                                        "A. WHITNEY."

No. 9. Indorsed: "Assignment of Weaver mortgage to Charles Herbert Whitney and brother, four sisters, six persons in all." Contents, a mortgage for $3,000, duly assigned to persons named on March 23, 1897.

No. 10. Indorsed to persons named. Contents, assignment of mortgage, March 23, 1897.

No. 11. Indorsement as above. Contents, assignment of mortgage, same date.

No. 12. Indorsed:

"Wyman Stanton mortgage, to be sent to Sarah E. Farnham, daughter of Alfred W. Budlong, now deceased. Her residence is Passaic, New Jersey; also check inclosed.
                                        ".A. WHITNEY."

Contents, assignment of mortgage; also a check to person named, $500.

No. 13. Indorsed: "Charles Wilbee, Esq., Adrian, Mich." Contents, assignment of mortgage, February 13, 1897.

No. 14. Indorsement similar to others. Contents, assignment of mortgage, March 16, 1897.

No. 15. Indorsement: " Louis Krigger and wife mortgage, assignment to Mary (Waller) Bohn, $100." Also the following memorandum:

"Mary Waller Bohn, Adrian, Michigan. At my death, whosoever has charge of my matters, hand this to Mary Bohn.

"A. Whitney."

Contents: On the inside of said envelope was an assignment, which had been executed by said Abel Whitney, with an express consideration of $100, to Mary Waller Bohn, of the same place, of a mortgage made by Louis Krigger and wife to Almira Budlong, purporting to have been executed on the 13th day of February, 1897, in the presence of Rial Clay and G. N. Jones, and on the same day duly acknowledged before Rial Clay, notary public. The signature that had been written to said assignment had been subsequently cut out, as appears by said written assignment. There was also found within said envelope the following memorandum:

· "This mortgage was assigned to Mary Waller Bohn, but soon after Mr. Krigger paid it. I therefore make my check payable to her, so in case of my death she can get the money that was paid on the mortgage as principal, viz., $100.

"A. Whitney."

Within said envelope was also found a check, dated April 6, 1897, on Waldby & Clay's Bank, made by said Abel Whitney, payable to Mary Waller Bohn, or order, for the sum of $100.

No. 16. Indorsement: "For Fanny Whitney Berdan, of Detroit." Contents, two municipal bonds, school district No. 1, townships of Ithaca, Star, Arcada, Newark, and Emerson, one for $500 and the other for $400; also the following memorandum:

"I give and bequeath unto Fanny Lee Berdan, daughter of my late brother William A. Whitney, Ithaca county school bond No. 28, for $500, which bond is herewith inclosed, due in 1902, together with coupons for the same, to be handed to her at my death, without further ceremony, by whosoever has charge of my estate.

"January 27th, 1899.    A. Whitney."

Also the further memorandum:

"I here add bond No. 30, herewith inclosed, $400, to be delivered to her in like manner as the $500 bond above described.

" A. WHITNEY."

No. 17. Indorsement:

"Note of S. N. Dada, to be sent or given to him at my death.

" A. WHITNEY."

Contents, another envelope, with the following *memoranda* upon it in the handwriting of said Whitney:

"Notes due me. In case of my death, these notes inclosed are to be given to the parties who made them.
" Dated April 15th, 1898.

" A. WHITNEY.

"Insurance on house in Home of New York expires in 1901. "

Also notes and policy referred to.

Envelope A. On the back of envelope A, hereinbefore referred to, is the following memorandum in the handwriting of said Whitney:

"How to dispose of any surplus of my estate after former amounts have been distributed as requested.

" A. WHITNEY."

On the back of said envelope is a further memorandum as follows:

" Circumstances had so changed since I made a will that it was not satisfactory to me, and I have taken this course to dispose of my estate something according with the present condition of matters.

"ABEL WHITNEY."

On the inside of said envelope was the following:

"ADRIAN, November 1, 1897.

" To whosover has charge of my estate: In settling the same, after distributing the assignments, deeds, checks, etc., drawn by me, whatever there may be left, if anything, I direct and authorize them to divide it equally between Josephine Harris, Augusta Teachout, daughters

of my late brother Russell Whitney, and Mrs. Mary Friday, now in my employ.

"A. WHITNEY."

Also a further memorandum as follows:

"ADRIAN, November 1, 1897.

"I want one Ithaca, Gratiot county, school bond of $500 belonging to me, in case of my death, handed to Augusta Whitney Teachout, one of the names mentioned in the assignment herewith, without further ceremony.

"A. WHITNEY."

No such bond was found, except such as had been specifically assigned by other writing.

Envelope B. On the back of said envelope B is the following memorandum in the handwriting of said Whitney: "To Frank W. Clay, or Rial, in case F. W. C. cannot attend to it or should die." On the inside of said envelope was found the following memorandum in the handwriting of said Whitney on the back of one of the pieces of paper:

"To Frank W. Clay, or Rial Clay, to be handed to one in case of my death.

"A. WHITNEY."

On the reverse side of said piece of paper is the following:

"ADRIAN, October 17th, 1898.

"To F. W. Clay, and, in case he cannot attend to the business, I want Rial to do so. In case of my death, I want you to step right into my matters and take charge of everything, and not allow my relatives or any one else to interfere or meddle with anything. Keep Mrs. Friday in the house to look after matters until everything is settled; and what I have given her is of my own accord. She has never asked me for a penny above her wages, but she has done for me more than any relative, and is entitled to all she gets and all I have provided for her. See that each one gets what I have intended for them, and pay no attention to any one else, for they have no business with my matters, and no right to anything from my estate beyond what I see fit to give them; and up to my death, unless for some expenses during my last illness, I do not owe any person one dollar. I have paid as I went along.

"ABEL WHITNEY."

On the inside of said envelope was another paper, upon the back of which was written in the handwriting of said Whitney the following instruction: "To Frank W. Clay, or, in case of his death, to his son Rial Clay, in relation to settling my matters in case of my death." On the other side of said piece of paper is the following, in the hand writing of said Whitney:

"ADRIAN, MICHIGAN, November 29th, 1898.

" *Dear Sir:* I have instructed Mrs. Friday, in case of my death, to take the keys to my boxes, and not allow any one else to have them until she and yourself or Rial look over the papers and distribute them to those who have assignments made to them, and, as far as it is possible, have them recorded and pay for the same, and write or send the paper to them, telling them the nature of the transfer to them, and any surplus divide it as I have instructed you to do in another paper. I leave the matters in this form to avoid going into probate, and this course is in all respects my will and wish. Of course, you will pay funeral expenses first, or at least save enough to do so and for your time and trouble. I do not owe any debts, unless there may be some during my last days that I have not been able to settle, and you are authorized to carry out these provisions the same as though I had done it myself or was alive to do it, and I hereby authorize you, as my attorney, to execute my will in these matters.

"Yours truly,

"ABEL WHITNEY.

"To Frank W. Clay, or, in case of his death, Rial Clay."

There was also found in said envelope another letter of instructions in the handwriting of said Whitney, as follows:

"ADRIAN, August 26th, 1899.

"To Frank W. Clay, Rial Clay, or whosoever has charge of my estate:

"Not knowing how soon I may be called to leave this earth, I make this *memoranda* to show that whatever I leave Mrs. Friday is my own voluntary act. I am more dependent on her than any other person on earth, as she is not only faithful, but honest, and I can trust her in any and all things. I intend to leave her with means sufficient to maintain herself without resorting to work out for her

living; and in case any one who may perhaps, according to our laws, claim as heir or heirs, but have no claim on me or my property, attempt to reverse this my wish, I want you to see that such person or persons do not get anything out of my property. I claim the right to leave it as I think proper. She has never asked me for anything, and what I give her is of my own will, and if any one, as it happens in many cases, attempts to slur or traduce her, see to it that they do not get anything, but, instead, give what might otherwise go to them to her (Mrs. Friday), and this shall be your voucher for your act. I have been disgusted with the way and manner heirs treat old and faithful women who devote their time and energies to the care of old and helples men, for the sake of getting what does not belong to them; and I want whosoever has charge of my matters to see to it that that is not permitted in this case, and, if necessary, spend all the rest of my estate in seeing this is not allowed. I am not either indebted to or under obligations to any relative living, and, if any of them get anything, they may be thankful for it, and, if they do not, they are not out of pocket on my account.

"Yours truly,

"ABEL WHITNEY."

Envelope C. On the back of the envelope marked "C" is the following memorandum in the handwriting of said Whitney:

"To Frank W. Clay, Rial Clay, to be referred, in case of my death, to whosoever has charge of my estate.

"A. WHITNEY."

On the inside of said envelope was found the following letter of instructions in the handwriting of said Whitney:

"ADRIAN, October 17th, 1898.

"In case of my death, I want Mrs. Friday to have such articles of crockery in the buttery as she may wish, including pans, knives and forks, and in fact everything in the buttery, only I would like for Mrs. Friday to divide about half between Mrs. Harris, Augusta Teachout, and Amelia Miller. The large upholstered rocking chair to Mrs. Harris, if she is alive; all the rest of the chairs to Mrs. Frary of that kind of furniture, that is, the maroon or red silk plush. Mrs. Friday to have the carpet in the kitchen and in the dining room, Mrs. Harris the carpet in

the parlor, and Augusta Teachout those in my bedroom and library. My books, mainly, to go to Charles H. Whitney, of Baker City, Oregon. I have already spoken of them in another paper to be referred to. Some of my books of poems might be distributed among different nephews and nieces, and I would wish to leave it so that whosoever has charge of my matters can use their discretion in making such distribution, according to taste and position of the individuals to receive them. The picture representing family group, including William A. Whitney, to go to Dwight A. Whitney; Lincoln and his cabinet to go to Mrs. Frary, of at present Ypsilanti, but her home is in St. Joseph county, Michigan; the bathing picture in the library to Dwight A. Whitney; and the one next to it, 'Crossing the Stream,' to Mrs. Friday. The cook stove to Mrs. Friday, and one coal stove to Mary Waller Bohn, one to Clanton, and one to Mrs. Harris. My tables, stands, bookcases, looking-glasses, and any other articles not hereinafter mentioned, to be given to such relatives as Mr. Clay or the manager may think best. There are a great many things difficult to specify, but divide them as just as possible, and according to the wishes of heirs. Photographs and such like, distribute as individuals wish them. Effie Dean's picture to Fanny Berdan. The clock in the library to Mrs. Friday, and that in the kitchen to Augusta Teachout. The bureau in what is called Augustus' room to go to Sampson Whitney; Almira's room to Mrs. Friday; the one in my bedroom to Mrs. Frary; the one in the library to Mary Bohn, if she wants it, if not, to Mrs. Friday. Articles in cellar like canned fruit, stone-ware, etc., cider and vinegar, leave it largely to Mrs. Friday to divide as she thinks best with my relatives and herself. Give the tools in the barn to Mrs. Harris. Anything not distinctly named so you will know what to do with it, leave it in the house, to go to those who have a deed of that in proportion to their share in the house.

"Yours truly,

"ABEL WHITNEY.

"To F. W. Clay, Rial Clay, or whosoever has charge of my estate as requested."

On the same piece of paper, and below the above, in the handwriting of said Whitney, is the further memorandum as follows:

"The white china in closet from dining room give to

Mrs. Frary, and the blue-ware set to Fanny Berdan. Give one mattress to Mrs. Friday, one to Helen Bohn, her niece's daughter, one to Mrs. Harris, and one to Augusta Teachout, and allow Mrs. Friday to distribute the bedding among heirs as she thinks best, or leave them in the house for those who have the deeds.

" A. WHITNEY.

"The silverware to the children of Mary Helen Bohn, their mother to divide the same between them.

" A. WHITNEY."

Also a further memorandum, as follows, in the hand-writing of Mr. Whitney:

" My picture in the parlor to be given to Mrs. Friday, and also that of Mrs. Whitney, and also that of Almira M. Budlong, if she would like them, instead of going to relatives. I think she would prize them more than the relatives would. The small family group picture in the parlor to be given to Mrs. Dr. N. H. Kimball. It could be enlarged if she wished to do so. This has been done by me.

" A WHITNEY.

" The bedstead, when the mattress is divided, to go with the mattress.

"A. WHITNEY."

The bill also alleges that, a short time before his death, the deceased handed to his housekeeper, Mary Freitag, his bank check for $500, a school bond for $500 issued by Ithaca school district, another school bond for $500, a mortgage and assignment for $1,700, and another for $800. The bank has refused to pay the check.

The estate has been inventoried at $34,620.12, and includes cash in bank $5,008.67. No debts were left by deceased, the funeral expenses have been paid, and the property is ready for distribution when the expenses of administration shall have been paid. Most persons interested consent to the distribution in accordance with the directions hereinbefore mentioned, but one or more of the heirs oppose. The bill is filed for directions in the premises, and prays a decree fixing the rights of the parties.

Several minor defendants answered by guardian *ad litem*, and several of the adult heirs by solicitor. Mary Freitag and others, not relatives of deceased, also answered. Most of the answers admit the allegations of the bill, and some ask that the directions of the deceased be given effect. A hearing was had, and the court made a decree:

"That Abel Whitney, in his lifetime, did divide the greater part of his property, and set it apart to the various parties mentioned in said bill and hereinafter named, and did make and constitute himself a trustee for the said parties, for the purpose of reserving unto himself the use thereof during his lifetime, and did all that was in his power to do to deliver to the said parties their portion thereof, consistent with his desire to retain the use for his support during his lifetime; and that the various letters of instructions left by him, and directed to Frank W. Clay, were for the purpose of informing the said Clay what he had done with his property, with instructions to said Frank W. Clay to make the delivery after his death; * * * that the division of the notes, mortgages, bonds, checks, etc., were made by the said Whitney, and put under separate covers for the parties named by him, meaning and intending by so doing to hold and treat it as their property; and that, when payments were made of interest on any of said notes, mortgages, or bonds, that was treated as his own, and used for his support so far as needed; and that, whenever payment was made upon the principal, that was treated as belonging to the party for whom it had been set apart, and the money, or its equivalent by way of check upon the bank, or in some other manner, was kept separate and distinct from the other property, but the party to whom it belonged should have the full benefit thereof."

It was adjudged and decreed that:

"Frank W. Clay proceed to carry out the instructions given him by said Abel Whitney in the writings left by him, in so far as it may be necessary to deliver and transfer to the parties entitled thereto that portion of the property set apart to them by the said Abel Whitney in his lifetime, and held by him as trustee aforesaid. * * * The mortgages, bonds, assignments, checks, and other papers delivered to Mary Freitag, as set forth in paragraph

28 of the bill, were delivered by the said Abel Whitney in his lifetime, and there was a valuable consideration therefor, and the same is hereby declared as property transferred to her to convey title, and the bank is hereby authorized to pay the check of $500 delivered to her. And it is further ordered that the various banks upon which the checks hereinbefore in this decree mentioned were drawn by the said Abel Whitney be, and are hereby, authorized to pay the same to the payees of said checks."

The appeal was taken by Sarah A. K. Frary, a niece, and Sarah Layton, the sister, of deceased. Their answers leave complainant to his proofs, allege that it would be unsafe to accept distribution in accordance with deceased's directions, and ask an adjudication of the rights of the parties. The testimony sustains the allegations of the bill in most essential particulars.

*R. A. Watts,* for complainant.

*John B. Ayres,* for defendant Sarah Layton.

*Stewart & Bliss,* for defendant Sarah A. Kline Frary.

*Morgan & Priddy,* for other defendants.

HOOKER, C. J. (*after stating the facts*). Complainant contends:

(1) That the acts of the deceased constituted him a trustee for the several persons named in the papers executed by him.
(2) That, if not, the deeds and assignments should be held to operate as a testamentary disposition of the property therein described.

Counsel for the defendants discuss three questions, into which they say that the case should be resolved, viz.:

"(1) Are the checks, including the one to Mrs. Freitag, legal transfers of the funds in the bank, and are the payees named therein entitled to draw the money from the bank thereon, or are they void?
"(2) Are the transfers of the real estate by way of deed and the transfers of mortgages by way of assignments valid and legal transfers of the property attempted to be

transferred to the persons named therein, or are they void for want of delivery?

"(3) Do the deeds and the assignments of mortgages operate as a will?"

We can have no doubt that the papers found in the tin box indicate the deceased's wishes as to the disposition of his property. Had he seen fit during his life to deliver the deeds and assignments to those for whom they were intended, the title would have passed, and they would have become valid gifts. Had he made a formal will directing such disposition, the law would carry out his expressed wishes. But he did neither.

1. Did the deceased hold the property in trust? This cannot have been, unless he devested himself of the equitable title to the property, and vested it in others. He executed deeds, and assignments of mortgages of real estate, and set them aside in packages for the respective parties. He drew checks upon his banker, and made the same disposition of them. He kept all of these in his own possession up to the time of his death. Clearly, if this was all that he did, these were not gifts, for want of delivery. See *Young* v. *Young*, 80 N. Y. 422 (36 Am. Rep. 634). Indeed, it is not claimed that they were gifts. The case last cited was much like the present, and, while it was intimated that a delivery to a trustee would be sufficient to complete a gift *inter vivos*, it was said that a trust would not be created except by acts or words, unequivocal, implying that the person held the property as trustee for another; and, while it is not necessary that the declaration of trust be in terms explicit, the donor must have evinced by acts which admit of no other interpretation that such legal right as he retains is held by him as trustee for the donee, or, as said in *Milroy* v. *Lord*, 4 De G., F. & J. 264, "The settler must transfer the property to a trustee, or declare that he holds it himself in trust." We have held that a donor may be a trustee for the donee. See *O'Neil* v. *Greenwood*, 106 Mich. 572 (64 N. W. 511). But it does not follow that the donor of an uncompleted gift is a trus-

tee in all cases.    In the case of *Young* v. *Young, supra,* attention is called to two cases where the courts practically held such a rule.    *Morgan* v. *Malleson,* L. R. 10 Eq. Cas. 475; *Richardson* v. *Richardson,* L. R. 3 Eq. Cas. 686. But the writer of the opinion says:

"In speaking of these cases in *Richards* v. *Delbridge,* L. R. 18 Eq. Cas. 11, Sir George Jessel, M. R., says:

" 'If the decisions of Lord Romilly [in *Morgan* v. *Malleson*] and of Vice Chancellor Wood [in *Richardson* v. *Richardson*] were right, there never could be a case where an expression of a present gift would not amount to an effectual declaration of trust.'

"And it may be added that there never could be a case where an intended gift, defective for want of delivery, could not, if expressed in writing, be sustained as a declaration of trust.    *Both of the cases cited are now placed among overruled cases.*"

He continues:

"In *Moore* v. *Moore,* 43 L. J. Ch. (N. S.) 623, Hall, V. C., says:

" 'I think it very important, indeed, to keep a clear and definite distinction between these cases of imperfect gift and cases of declarations of trust, and that we should not extend, beyond what the authorities have already established, the doctrine of declarations of trust, so as to supplement and supply what otherwise would be mere imperfect gifts.'

"If the settlement is intended to be effectuated by gift, the court will not give effect to it by construing it as a trust.    If it is intended to take effect by transfer, the court will not hold the intended transfer to operate as a declaration of trust, for then every imperfect instrument would be made effectual by being converted into a perfect trust.    *Milroy* v. *Lord,* 4 De G., F. & J. 264.

"The case of *Martin* v. *Funk* [75 N. Y. 134] and kindred cases cannot aid the respondent.    In all those cases there was an express declaration of trust.    In the one named, the donor delivered the money to the bank, taking back its obligation to herself in the character of trustee for the donee; thus parting with all beneficial interest in the fund, and having the legal title vested in her in the character of trustee only.    No interposition on the part of

the court was necessary to confer that character upon her; nor was it necessary by construction or otherwise to change or supplement the actual transaction. None of the difficulties encountered in the present case stood in the way of carrying out her intention. It was capable of being executed in the form in which it was expressed.

"The question whether a remainder in a chattel may be created and given by a donor by carving out a life estate for himself and transferring the remainder, without the intervention of a trustee, is learnedly discussed in the appellant's brief; but the views we have expressed render it unnecessary to pursue that inquiry. We are satisfied that it is impossible to hold that the facts as they appear establish a valid transfer of any interest in the bonds in question to the donee, and that the attempted gift cannot be sustained as a declaration of trust."

Accordingly, we have held that an expression of an intention to pay another $1,000, in accordance with the expressed wish of the husband of the person expressing such an intention, did not create a trust. *Hamilton* v. *Hall's Estate,* 111 Mich. 291 (69 N. W. 484). It was there said that, "to create a trust, where the donor retains the property, the acts or words relied upon must be uneqivocal,"—citing 27 Am. & Eng. Enc. Law, 56; and that "this rule applies with peculiar force where it is claimed that the donor constituted himself trustee." As said there:

"The mere declaration of an intention or purpose to create a trust, which is not carried out, is of no value, and a mere agreement or statement of an intent to make a gift in the future is not sufficient. It must be such that, from the time it is made, the beneficiary has an enforceable equitable interest in the property, contingent upon nothing except the terms imposed by the declaration of the trust itself."

See, also, *Peninsular Sav. Bank* v. *Wineman,* 123 Mich. 257 (81 N. W. 1091).

These cases show that the mere making of the deeds and checks and keeping them in possession are as far from creating a trust as they are from making a completed gift *inter vivos.* We must, therefore, look at these and other

writings, and the acts and words of the deceased, for a declaration of a trust, or its equivalent, failing to find which we must say there was no trust. Counsel call attention to the directions given Mr. Clay; also deceased's actions in two instances in dealing with the property, where he is said to have accounted for certain moneys collected upon two mortgages previously assigned. These instances appear from *memoranda* of the deceased found in two of the envelopes. They have been quoted, but are repeated for convenience:

"ADRIAN, June 10th, 1897.

"As the Lehman mortgage has been assigned to Charles Herbert Whitney, of Baker City, Oregon, and Lehman paid $200 on it, I make a check for that amount, payable to the order of said C. H. W., to take the place of the $200 indorsed on that mortgage; the check to be sent to him in case of my death at once, by whosoever has charge of my business.

"A. WHITNEY."

"This mortgage was assigned to Mary Waller Bohn, but soon after Mr. Krigger paid it. I therefore make my check payable to her, so in case of my death she can get the money that was paid on the mortgage as principal, viz., $100.

"A. WHITNEY."

So far as these two transactions are concerned, the action of the deceased is as consistent with defendants' theory as complainant's, and therefore should not be said to declare a trust.

Coming next to the conversations with Clay, decedent's statements to him and others that he had disposed of his property as he wanted it to go are as consistent with the idea that he had made a will (as he had at one time apparently done), or that he had parceled it out in the way that the record shows, to be given effect after death, if not changed, as that he intended Clay to understand that he was holding it as trustee, which he could easily have said if it was his design. See *Young* v. *Young*, 80 N. Y. 435 (36 Am. Rep. 634), for a parallel case on this point.

We will next examine the contents of the envelopes.

No. 1. In this deceased says: "In addition to the inclosed deed, I want each one named in it to have the following sums in money, and I have made checks for the amounts, *to be delivered to them at my death.*" He concludes as follows: "Mr. Clay, or whosoever has these papers, deliver them to the parties *at my death.*" Clearly, he did not hold the checks in trust; and why should not this fact, and the language used, characterize his holding of the deed inclosed and withheld from the grantees? This is certainly no declaration of trust.

No. 4. "This is to be handed to the officers of the Oakwood Cemetery Association *in case of my death.*" This envelope contained two checks. Why were these retained, if he intended to pass title to the money?

No. 6. The contents of this envelope were to be "sent to Emily Jane Van Buskirk, *in lieu of anything in my will.*" This indicates that he had made or contemplated a will, and is not consistent with the idea of a trust.

No. 7. Contents "to be delivered to him at the time of my death."

No. 8. A similar provision is found here.

No. 15. "At my death, *whosoever has charge of my matters*, hand this to Mary Bohn." This was one of the cases where he subsequently made a collection, hereinbefore mentioned, and substituted his check for the security paid.

No. 16. Here he "*gives and bequeaths*" a bond, "to be handed to her at my death, without further ceremony, by *whosoever has charge of my estate.*" He afterwards added another bond, to be delivered to her in like manner. The words "give and bequeath" are suggestive of a future, rather than a present, delivery, and is not appropriate language for a declaration of trust.

No. 17. "Note of S. N. Dada, to be sent or given to him at my death." And again: "In *case of my death*, these notes inclosed are to be given to the parties who made them."

There is not any evidence of a trust in these papers. On the contrary, it seems plain that the deceased proposed to keep them until he died. The letters contained in envelopes A, B, and C do not indicate that the deceased supposed that he held this property in trust. On the contrary, they direct distribution after death, and one, found in Exhibit B, states that he "left matters in this form to avoid going into probate, and this course is in all respects my will and wish;" while in another he discusses Mrs. Freitag, and directs *whoever shall have charge of his matters* to see to it that she gets what he intends for her, and, "if necessary, *spend all the rest* of my estate" to that end. This is cogent evidence that he proposed to keep control of his estate during life. The letter in Exhibit C has all of the attributes of a will, except a proper execution, as far as it goes. It contains nothing in the nature of a declaration of trust as to the articles mentioned.

Counsel rely, in their contention that this property was held in trust, upon the cases of *Ellis* v. *Secor*, 31 Mich. 185 (18 Am. Rep. 178), and *O'Neil* v. *Greenwood*, 106 Mich. 572 (64 N. W. 511). The former was a trover case, and the defense was based upon a gift *causa mortis*. The circumstances in that case show that the donor was *in extremis*, and did all that she could to express a present intention to make a gift, and this was held sufficient to defeat trover brought by the administrator. The case of *O'Neil* v. *Greenwood* was much stronger than the present case, and there was strong evidence of an explicit declaration of trust. No trust was created in the present case, for there is nothing which indicates an intention that effect should be given to any of the papers before his death.

This discussion has not taken into consideration the question whether a trust in real estate can be created in the way claimed, under our statute of uses and trusts.

2. Can the deeds and assignments of mortgages be treated as a testamentary disposition of the property? Counsel for the complainant appears to concede that the checks cannot be so treated, and there is nothing upon

the faces of the deeds and assignments to indicate that they were not to take immediate effect, which they would have done had they been delivered. We must look, then, to other circumstances to show the testamentary character, and there is plenty of evidence tending to show that intent, provided it can be said to be such evidence as the law accepts. Thus we have seen that most of the envelopes contained *memoranda* showing an intent that these gifts should be given effect after death, and the letters to Clay contain similar indications; but no writing which contains such evidence was executed in conformity to the statute of wills. Had such *memoranda* not been accompanied by the deeds and assignments, no one would claim that they could be given effect as wills; and whatever force is to be given to them must come from the fact that formal deeds and assignments, duly witnessed, were inclosed with them. We think it obvious that no paper not executed in conformity to our statute can be considered a will, and, with the exception of the deeds and assignments, these papers were not. Whether the deeds and assignments may be so considered depends on the intent of the deceased and the character of the proof disclosing such intent. If the intent must appear upon the face of the instruments themselves, we cannot hold them to be testamentary, for it does not so appear; but, on the other hand, if the question of intent is susceptible of proof by parol, and is permissible where the instrument is unambiguous upon its face, it will be easy to infer such intent.

The cases may be divided into three classes:

(1) Those in which the testamentary intent is clearly deducible from the writing.

(2) Those where the instrument is ambiguous, or of doubtful meaning.

(3) Those where there is nothing to indicate a testamentary intent, but, on the contrary, the instrument is in terms plainly a deed.

In the first class of cases there is no difficulty in holding the document to constitute a will, if properly executed.

In the second class the instrument may doubtless be interpreted in the light of the circumstances. In cases of the third class (and it is in this class that the documents properly belong), may the instrument be contradicted, and determined to be a will, upon extrinsic evidence of an intent on the part of the deceased that it be given effect by delivery upon his death? This is really the only important question in the case, for, answered in the affirmative, we have ample evidence to justify us in calling the instruments a will, while a negative answer will require us to treat them merely as undelivered deeds, without force.

We have been unable to find a Michigan case directly in point. *Bigley* v. *Souvey*, 45 Mich. 370 (8 N. W. 98), is a case of the first class. In *Lautenshlager* v. *Lautenshlager*, 80 Mich. 285 (45 N. W. 147), the writing contained evidence indicating an intent that it was to take effect at death, and, like *Ferris* v. *Neville*, 127 Mich. 444 (86 N. W. 960, 54 L. R. A. 464, 89 Am. St. Rep. 480), it belongs to the second, if, indeed, it does not belong to the first, class. The remaining case of *Lincoln* v. *Felt*, 132 Mich. 49 (92 N. W. 780), arose over a lost deed. The case went to the jury upon the question whether the decedent's intent was that the gift should take effect only after death, and that such intent was expressed in the instrument in some appropriate form. The jury found it to be a will, and the order entered in accordance with the verdict was affirmed. Clearly, this was as favorable instruction as the contestants could ask; but it is obvious that the question before us now was not passed upon.

The proposition is to show that certain instruments, which could only become effective by delivery, can be made effective by calling them by another name, and giving them an interpretation which their words do not warrant, through parol evidence tending to show that such was the decedent's intention. The authorities cited in support of this contention are the *Lautenshlager Case,* hereinbefore mentioned, which does not support it, and a statement in 29 Am. & Eng. Enc. Law, at page 158, where

it is said that "evidence is admissible to show that a deed
or other instrument of gift, which on the face of it is not
testamentary, was not intended to operate until the death
of the person executing it; to show that an instrument on
the face of it testamentary was not written *animo tes-
tandi;* but not to show that the operation of a will abso-
lute in its terms depends upon a condition." An exami-
nation of the authorities cited in support of the first propo-
sition will show that they are for the most part cases where
the instrument was reasonably open to two constructions,
and related to personal property.   Thus in *Cock* v. *Cooke*,
1 L. R. P. & D. 241, a paper was executed in the follow-
ing language:   "I wish Mym Sister, Louisa Cock, * * *
to have my Schering (Charing) Cross bank book for her
own use."   Proof that it was executed in contemplation
of death, and as a bequest, was admitted.   It was clearly
open to that construction upon its face, and can hardly be
said to have been a valid present gift or assignment.   In
the *Goods of Morgan*, 1 L. R. P. & D. 214, the instru-
ments all contained clauses directing that the conveyances
were not to take effect until after the testator's decease.
Nothing is said in this case about extrinsic evidence.   In
*Robertson* v. *Smith*, 2 L. R. P. & D. 43, the deceased
died November 8th, having made a will July 29th, and a
codicil October 12th, previous.   November 7th he exe-
cuted a document in the presence of two witnesses, to the
following effect, viz.:   "I hereby make a free gift to
Maria R. of sixty pounds, and to John V. of fifty pounds,
being the sum deposited by me with," etc.   Parol evidence
of the situation was admitted to show the intent to make a
testamentary gift.   In *Goods of Coles*, 2 L. R. P. & D.
362, the paper was plainly as consistent with the intention
of a testamentary disposition as a gift *inter-vivos;* in fact,
more so.   The circumstances were shown, and it was held
a will.   *Lister* v. *Smith*, 3 Swab. & T. 282, is not in point
upon this question, while *In re Goods of English*, 3 Swab.
& T. 586, is similar to *Cock* v. *Cooke, supra.*   The instru-
ment considered in *Robertson* v. *Dunn*, 6 N. C. 133 (5 Am.

Dec. 525), was doubtful upon its face. If the text is construed in the light of these decisions, it does not support the proposition that parol evidence may be offered to show that a deed not doubtful upon its face was intended to have a testamentary effect.

In 1 Underhill, Wills, § 37, it is said:

"The courts, in determining whether an instrument disposing of real estate is a deed or a will, are guided by the following considerations: If the instrument, whatever its form or the mode of its execution, *passes a present interest, which vests from the time of its execution, it will be a deed,* though the possession and the enjoyment of the estate granted in it do not accrue to the grantee until a future time. On the other hand, if the instrument, though it is in form a deed, *does not convey any vested interest, right, or estate until the death* of the person executing it, it will be regarded as testamentary and revocable.

"The employment of language appropriate to either instrument is never controlling. Nor is the belief of the maker or an understanding between the parties interested that the instrument is a will or a deed conclusive upon the court (except when made so by statute), though evidence as to the belief of the parties as to its operation and effect is relevant to show their understanding as to the intention in executing it. The court must take into consideration the language of the instrument, and the circumstances surrounding the parties and attendant upon its execution; and if, from all the evidence, it appears to have been the intention of the maker that the instrument shall have a *post mortem* effect only, it will be held to be a testament, and not a deed."

In discussing the admissibility of parol evidence, the author says:

"In seeking the intention of the maker of an instrument, the court must, in the first instance, consult the language of the writing itself. The fact that the writing which is presented for probate is testamentary in form is some evidence that it is a will. The form of the instrument is not controlling. The court of probate may go outside of the writing to ascertain its character; *not to supply an intention which cannot be found in it,* but to ascertain

with what intention .the execution of the instrument was accompanied." Id. § 39.

This plainly implies the correct rule that the writing must be susceptible to such a construction without doing violence to its plain terms, and no amount of parol testimony should authorize a court to vary the unmistakable terms of the instrument alleged to be a will. These papers plainly provide in terms for a present transfer of property, and to show that a different intention existed would be to contradict them, and this cannot be done.

We have examined many authorities where the question involved was whether papers in form deeds were testamentary in character, and it is a significant fact that not one has been found which supports the complainant's contention. In nearly every instance the question is solved from the writing itself, or, if not, the construction adopted is not contradictory to its provisions, which are open to two interpretations. We cite a number of the cases alluded to: *Stevenson* v. *Huddleson*, 52 Ky. 299; *Armstrong* v. *Armstrong*, 4 Baxt. 357; *Miller* v. *Holt*, 68 Mo. 584; *Brewer* v. *Baxter*, 41 Ga. 212 (5 Am. Rep. 530); *Fulcher* v. *Royal*, 55 Ga. 68; *Williams* v. *Tolbert*, 66 Ga. 127; *Worley* v. *Daniel*, 90 Ga. 650 (16 S. E. 938); *Goff* v. *Davenport*, 96 Ga. 423 (23 S. E. 395); *Hall* v. *Bragg*, 28 Ga. ˙330; *Herrington* v. *Bradford's Ex'x*, Walk. (Miss.) 520; *Wall* v. *Wall*, 30 Miss. 91 (64 Am. Dec. 147); *Sartor* v. *Sartor*, 39 Miss. 760; *Sewell* v. *Slingluff*, 57 Md. 537; *Lauck* v. *Logan*, 45 W. Va. 251 (31 S. E. 986); *Wren* v. *Coffey*, (Tex. Civ. App.) 26 S. W. 142; *Bowler* v. *Bowler*, 176 Ill. 541 (52 N. E. 437); *Robinson* v. *Brewster*, 140 Ill. 649 (30 N. E. 683, 33 Am. St. Rep. 265); *Burlington University* v. *Barrett*, 22 Iowa, 60; *In re Longer's Estate*, 108 Iowa, 34 (78 N. W. 834); *President, etc., of Bowdoin College* v. *Merritt*, (C. C.) 75 Fed. 480; *Cates* v. *Cates*, 135 Ind. 272 (34 N. E. 957); *Stroup* v. *Stroup*, 140 Ind. 179 (39 N. E. 864, 27 L. R. A. 523); *Bromley* v. *Mitchell*, 155 Mass. 511 (30 N. E. 83); *Walker* v. *Jones*, 23 Ala. 448; *Gillham* v. *Mus-*

*tin,* 42 Ala. 365; *Mosser* v. *Mosser's Ex'r,* 32 Ala. 551; *Hall* v. *Burkham,* 59 Ala. 349; *Sharp* v. *Hall,* 86 Ala. 113 (5 South. 497, 11 Am. St. Rep. 28); *Jordan* v. *Jordan's Adm'r,* 65 Ala. 301; *Crocker* v. *Smith,* 94 Ala. 295 (10 South. 258, 16 L. R. A. 576); *Turner* v. *Scott,* 51 Pa. St. 126; *Patterson* v. *English,* 71 Pa. St. 454; *Knox's Estate,* 131 Pa. St. 220 (18 Atl. 1021, 6 L. R. A. 353, 17 Am. St. Rep. 798); *Outlaw* v. *Hurdle,* 46 N. C. 150; *Lyles* v. *Lyles,* 2 Nott· & McC. 531; *Hone* v. *Van Schaick,* 3 N. Y. 538; *Hazleton* v. *Reed,* 46 Kan. 73 (26 Pac. 450, 26 Am. St. Rep. 86); *Lacy* v. *Comstock,* 55 Kan. 86 (39 Pac. 1024); *In re Ogle's Estate,* 97 Wis. 56 (72 N. W. 389); *Clarke* v. *Ransom,* 50 Cal. 595; *Leaver* v. *Gauss,* 62 Iowa, 314 (17 N. W. 522); *Daniel* v. *Hill,* 52 Ala. 430; *Frew* v. *Clarke,* 80 Pa. St. 170.

That parol evidence is not admissible to add to, alter, vary, or contradict a will, see the following: 1 Redf. Wills, p. 426, sub. 8, and cases cited, and page 435, sub. 21, page 496, sub. 2, page 501, sub. 10, page 507, note 21; *Hone* v. *Van Schaick,* 3 N. Y. 544; *President, etc., of Bowdoin College* v. *Merritt,* (C. C.) 75 Fed. 480, syl. 3; *Sewell* v. *Slingluff,* 57 Md. 537; *Herrington* v. *Bradford's Ex'x,* Walk. (Miss.) 520; *Miller* v. *Holt,* 68 Mo. 584; *Armstrong* v. *Armstrong,* 4 Baxt. 357. For a discussion of this general subject, see 19 Cent. L. J. 46.

We have had difficulty in finding a case in which the exact point before us is raised, but it seems manifest that the same rule that forbids the contradiction of an established will should forbid the contradiction of the same instrument as a means of establishing it as a will, when its terms plainly show it to be a deed conveying a present interest. It is only when the writing is of doubtful import that interpretation by the aid of extrinsic evidence becomes necessary, and in such case interpretation, not contradiction, is permissible.

We are reluctantly driven to the conclusion that we cannot give effect to the deceased's manifest desire, a desire so well established, and so apparently well grounded

and just, as to merit our approbation; but we fear that the trite saying that "hard cases make bad law" would be applicable should we sustain the complainant's contention.   To do so would be to override established rules and principles essential to the protection of the rights of heirs.

It remains to refer to the rights of Mrs. Freitag.   The record indicates that the papers designed for her were delivered to her, and we do not know that any one disputes it.   Being delivered, they became gifts *inter vivos*, and conveyed title to her.   As to the check for $500, we feel justified in finding it to be based upon a valid and sufficient consideration, and therefore collectible against the estate. The parties are all before the court, and we think that her rights should be set at rest by this decree.   Otherwise we are of the opinion that the property should be decreed to be assets of the estate, subject to administration in accordance with law.   Neither party will recover costs, except Mrs. Freitag.   She will recover costs from the estate. The disbursements of the complainant should be allowed him from the estate.

Decreed accordingly.

The other Justices concurred.